1              IN THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF NEW JERSEY
2              Civil 14-2094   ES

3   MYLAN PHARMACEUTICALS,

4                                    PLAINTIFF

          V.
5                                              ORAL OPINION

6

7   CELGENE CORPORATION,

                                     DEFENDANT.
8

9

                                     NEWARK, NEW JERSEY
10                                   DECEMBER 22,2014

11         B E F O R E:   HONORABLE ESTHER SALAS,
                   UNITED STATES DISTRICT JUDGE
12

13

14

    Pursuant to 753 Title 28 United States Code,  the following
15  transcript is certified to be an accurate record as taken
    stenographically in the above-entitled proceedings.
16
                         S/   LYNNE JOHNSON
17

18                       Lynne Johnson, CSR, CM, CRR
                         Official Court Reporter
19

20

21

22            LYNNE JOHNSON, CSR, CM, CRR
              OFFICIAL COURT REPORTER
23            UNITED STATES DISTRICT COURT
              P.O. BOX 6822
24            LAWRENCEVILLE, NJ  08648
              EMAIL:  CHJLAW@AOL.COM.

25

1        THE COURT:  Before the Court is Defendant Celgene

2   Corporation's motion to dismiss the Complaint filed by Mylan

3   Pharmaceuticals, Inc. (D.E. No. 17).  The Court has

4   considered the briefs submitted by the parties and the

5   Federal Trade Commission, (D.E. Nos. 17-1, 24, 26-3, and 31),

6   as well as the arguments presented by counsel at oral

7   argument on December 9, 2014. For the reasons below, the

8   Court GRANTS *without prejudice* in part and denies in part

9   Celgene's motion to dismiss.

10  **II. LEGAL STANDARD**

11       To survive a motion to dismiss, a complaint must

12  only allege "enough facts to state a claim to relief that is

13  plausible on its face." *Bell Atl. Corp. V. Twombly*, 550 U.S.

14  544, 570 (2007). A claim has facial plausibility when the

15  plaintiff pleads factual content that allows the court to

16  draw the reasonable inference that the defendant is liable

17  for the misconduct alleged." *Ashscroft v. Iqbal*, 556 U.S.

18  662, 678 (2009). "The plausibility standard is not akin to a

19  'probability requirement,' but it asks for more than a sheer

20  possibility that a defendant has acted unlawfully." *Id*.

21       "When reviewing a motion to dismiss, '[a]ll

22  allegations in the complaint must be accepted as true, and

23  the plaintiff must be given the benefit of every favorable

24  inference to be drawn therefrom.'" *Malleus v. George*, 641

25  F.3d 560, 563 (3d Cir. 2011) (quoting *Kulwicki v. Dawson*, 969

F.2d 1454, 1462 (3d Cir. 1992)). But the court is not required to accept as true "legal conclusions," and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

The Third Circuit has expressly cautioned that "it is inappropriate to apply *Twombly*'s plausibility standard with extra bite in antitrust and other complex cases." *West Penn Allegheny Health Sys. Inc. V. UPMC*, 627 F.3d 85, 98 (3d Cir. 2010).

**III. FACTS**

Celgene is a branded drug company that manufactures and distributes two life-saving but dangerous drugs: Thalidomide (Thalomid) and lenalidomide (Revlimid). (Compl. ¶¶ 2-3).

Thalomid was approved in 1998 to treat lesions associated with leprosy. (*Id.* ¶ 59). It was later indicated for co-use with another drug to treat multiple myeloma. (*Id.* ¶ 3). In connection with the FDA approval of Thalomid, Celgene adopted the System for Thalidomide Education and Prescribing Safety (S.T.E.P.S.), a program for distributing the drug in accordance with strict safety protocols. (*Id.* ¶ 4). In 2007, when Congress gave the FDA statutory authority to condition the approval of drug application on acceptable safety protocols, called Risk Evaluation and Mitigation

Strategies (REMS), S.T.E.P.S. was deemed an approved REMS program (D.E. No. 17-1 ("Moving Br.") At 7-8). Celgene has several patents covering Thalomid, the last of which expires in 2023. (*Id*. At 9).

Remlivid was approved in 2005 for the treatment of a subset of multiple myeloma, myelodysplastic syndrome, and mantle cell lymphoma patients.  As with Thalomid, Celgene distributes Remlivid through a REMS program. Celgene's patents on Remlivid extend through 2027. (*Id*. At 11). Mylan, a generic drug company, alleges that Celgene has maintained an unlawful monopoly over Thalomid and Revlimid by preventing lower-priced generic competition from entering the market. (Compl. ¶ 2). Specifically, Mylan alleges that Celgene "used REMS as a pretext to prevent Mylan from acquiring the necessary samples to conduct bioequivalence studies." (*Id*. ¶ 7). The FDA requires any generic drug application to include bioequivalence studies comparing the generic product with the branded product. (*Id*. ¶ 8).

**a. Thalomid**

Mylan began efforts to develop a generic version of Thalomid in September 2003. (Compl. ¶ 13). It originally tried to obtain samples through wholesale distribution channels, but was unable to do so because of the S.T.E.P.S. program. (*Id*. ¶ 75).

In October 2004, Mylan sent a letter to Celgene

through a third party requesting to purchase Thalomid samples.  Seven months later, it sent a second request. Celgene responded in June 2005, confirming that Thalomid is unavailable through wholesale distribution and stating that it was against policy to deal with intermediaries in the sale of Thalomid. (*Id*. ¶¶ 75-76).

Mylan reached out to Celgene directly in September 2005. (*Id*. ¶ 77). One month later, Celgene wrote back to explain that it needed additional time to respond given the requirement that Thalomid is distributed exclusively through S.T.E.P.S. (*Id*. ¶ 77-78). In December 2005, Celgene responded that it would need the FDA's agreement to allow samples to be distributed outside of S.T.E.P.S. and recommended that Mylan contact the FDA. (*Id*. ¶ 79).

Mylan contacted the FDA in January 2006, requesting that the FDA provide Celgene with written authorization for it to provide Thalomid samples and providing the protocols for its 3 planned studies. (*Id*. ¶¶ 80-82). The FDA responded to request that Mylan provide either an investigational new drug ("IND") application or a more detailed study protocol. (*Id*. ¶ 83). Mylan submitted the requested study protocols in May 2007. (*Id*. ¶ 84).

In September 2007, the FDA responded that Mylan's Thalomid protocols were "acceptable," and included additional recommendations that Mylan would need to follow in conducting

its studies. (Id. ¶ 86). Mylan informed Celgene of the FDA's
letter in November 2007 and reiterated its request for
samples.  It followed up again in December. (*Id*. ¶¶ 87-89).
In January 2008, Celgene responded and asserted that it could
still not provide samples due to "concerns about distributing
Thalomid outside of the S.T.E.P.S. program [that] are
independent of FDA's regulatory oversight." It instead
requested that Mylan produce to Celgene ten categories of
information relating to Mylan's planned use of the samples,
history of FDA compliance, product liability insurance, etc.
(*Id*. ¶¶ 90-99).

Mylan responded in February, agreeing to deliver
the information on a confidential basis and enclosing a
confidentiality agreement. Celgene responded with proposed
edits to the agreement in April and June 2008. The agreement
was executed in June 2008, and Mylan sent its materials to
Celgene. (*Id*. ¶¶ 102-07). In addition, Mylan stated that it
would agree to indemnify Celgene for any liability resulting
from Mylan's studies. (*Id*. At 108).

Celgene responded with a draft indemnification
agreement in August 2008, and Mylan sent a responsive letter
in October 2008 expressing concerns about the agreement's
overbreadth. (*Id*. ¶¶ 113-14). The parties eventually reached
agreement on the terms of indemnification in April 2009. (*Id*.
¶¶ 120).

1      In October 2008, while the negotiations over the

2 indemnification agreement were ongoing, Celgene sent Mylan a

3 second request for information. Mylan responded with

4 additional information in April 2009. Celgene again sought

5 more materials about Mylan's insurance coverage in June 2009.

6 (*Id.* ¶¶ 118-20).

7      Finally, after attempting to engage with Celgene

8 for almost five years to procure samples, Mylan "recognized

9 that further engagement with Celgene would be fruitless."

10 (*Id.* ¶ 128).

11 **b. Revlimid**

12      Mylan alleges that Celgene followed a "nearly

13 identical path of delay" for Revlimid, and that it worked to

14 obtain samples from August 2009 to May 2012. (*Id.* ¶¶ 130,

15 134).

16      Mylan submitted its safety protocols for Revlimid

17 bioequivalence studies to the FDA in August 2012. The FDA

18 deemed them "acceptable" in October 2012 but requested

19 additional information. (*Id.* ¶ 135-36). In addition, the FDA

20 told Mylan that it would be willing to inform Celgene that

21 the FDA had received sufficient assurance regarding any

22 planned testing. (*Id.* ¶ 137). In November 2012, Mylan

23 provided additional information requested by the FDA and gave

24 the FDA permission to notify Celgene once Mylan's protocols

25 were approved. In February, the FDA requested additional

1    information and identified more recommendations, and Mylan

2    responded again in May 2013. In July 2013, the FDA informed

3    Mylan that its protocols were adequate and that it would

4    notify Celgene to request that Celgene provide Mylan with

5    samples. (*Id*. ¶¶ 138-142).

6         Mylan wrote to Celgene in May 2013 to inform

7    Celgene that the FDA letter was forthcoming and to request

8    the samples. In response, Celgene advised Mylan that it

9    needed to wait until it received notice from the FDA. In

10   addition, as it had for Thalomid, Celgene requested

11   additional information from Mylan and indicated that it would

12   require an indemnification agreement. (*Id*. ¶¶ 143-147).

13        In January 2014, Mylan submitted to the FDA (at its

14   request) a formal Disclosure Authorization to the FDA

15   allowing it to contact Celgene and share with it the fact

16   that the FDA had received a request from Mylan for assistance

17   in obtaining samples.  In March 2014, following final

18   endorsement of its safety profiles, Mylan again sent a letter

19   to Celgene notifying that it would not engage in

20   back-and-forth correspondence as it did with Thalomid and

21   asking Celgene to provide samples by March 14, 2014. (*Id*. ¶¶

22   149-50). It also sent an executed indemnification agreement.

23   (*Id*. ¶ 151).

24        Celgene responded on March 20, 2014 that it

25   required eight additional categories of information. It also

did not sign the agreement, indicating that it would consider the terms after receiving the additional information. (*Id.* ¶¶ 152-56).

## III. DISCUSSION

### a. § 2 CLAIMS

Celgene urges the Court to dismiss Mylan's claims under § 2 of the Sherman Act. A plaintiff alleging a § 2 violation must plead: (1) monopolization; and (2) "the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Verizon Communs., Inc. V. Law Offices of Curtis v. Trinko,* LLP, 540 U.S. 398, 407 (2004) (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966). Here, the parties dispute element (2), also known as requirement of "anticompetitive" or "exclusionary" conduct. Celgene argues that its conduct is not exclusionary as a matter of law because Section 2 does not impose an affirmative duty to deal with competitors except under limited circumstances, which it argues are inapplicable here. (Moving Br. At 14). Mylan argues that that Celgene's conduct falls within the scope of cases where a duty to deal applies. (D.E. No. 24 ("Opp. Br.") at 14). The Court finds that Mylan has pled facts that may plausibly give rise to a duty to deal, and therefore denies Celgene's motion to dismiss Mylan's § 2 claims.

1      In general, there is no affirmative duty to deal

2 with competitors. *United States v. Colgate & Co.*, 250 U.S.

3 300, 307 (1919). However, this right is not unqualified, and

4 an affirmative duty to deal may arise under limited

5 circumstances. *See generally Trinko*; *Aspen Skiing Co. V.*

6 *Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985); *Otter Tail*

7 *Power Co. V. United States*, 410 U.S. 336 (1973). The parties

8 primarily dispute the scope of the exception, and the factors

9 that must be present for an affirmative duty to

10 arise—particularly, whether a prior course of dealing between

11 the parties is required.

12      Celgene argues that there is an affirmative duty to

13 deal with competitors only when (1) there is a prior course

14 of dealing between the parties; and (2) the alleged

15 monopolist irrationally forsook short-term profits for

16 long-term anticompetitive gain—in other words, its actions

17 made "no economic sense." (Moving Br. At 14). Mylan responds

18 that it only needs to plead the second factor, and that there

19 is no requirement of a "prior course of dealing" between the

20 parties. (Opp. Br. At 20).

21      The parties (and the Court's) consideration of the

22 scope of the exception to the "no duty to deal" rule begins

23 with *Aspen Skiing*.  In *Aspen Skiing*, the Supreme Court held

24 that a defendant violated § 2 when it terminated a

25 long-standing, profitable business relationship in which the

1    parties offered joint ski passes to both parties' ski

2    mountains. *Aspen Skiing*, 472 U.S. at 587-95. The Supreme

3    Court wrote that the "most significant" evidence supporting §

4    2 liability was the suggestion that the defendant's conduct

5    was not "justified by any normal business purpose." *Id.* At

6    608. To the contrary, the defendant "elected to forgo []

7    short-run benefits because it was more interested in reducing

8    competition in the Aspen market over the long run." *Id.*

9    *The Supreme Court revisited Aspen Skiing* nearly 20 years

10   later in *Trinko*.  In *Trinko*, the Supreme Court held that

11   Verizon's failure under the Telecommunications Act of 1996 to

12   facilitate market entry by competitors did not state a § 2

13   claim.  It held that "*Aspen Skiing* is at or near the outer

14   boundary of § 2 liability," *Trinko*, 540 U.S. at 409, and

15   proceeded to distinguish *Aspen Skiing* on a series of facts.

16   Significantly, the Supreme Court explained that, in *Aspen*

17   *Skiing*, the "unilateral termination of a voluntary (*and thus*

18   *presumably profitable*) course of dealing suggested a

19   willingness to forsake short-term profits to achieve an

20   anticompetitive end." *Id.* (Emphasis in original).  In *Trinko*,

21   on the other hand, "the complaint does not allege that

22   Verizon ever engaged in a voluntary course of dealing with

23   its rivals," and therefore "its prior conduct sheds no light

24   upon whether its lapses from the legally compelled dealing

25   were anticompetitive." *Id.*  Thus, the Supreme Court reasoned

1   that "prior course of dealing" was relevant to the § 2

2   inquiry insofar as it served as a proxy for the larger

3   inquiry of whether the defendant's conduct was

4   anticompetitive.

5          *Trinko* also distinguished itself from *Aspen Skiing*

6   on grounds that, in *Aspen Skiing*, the defendant refused to

7   sell a product to its competitor at retail price even though

8   it had sold it at that price to others. *Id.*  This fact was

9   further indicative of anticompetitive conduct, and missing

10  from the record in *Trinko*. *Id.*  There can be not dispute that

11  the question of whether a defendant sold its product at

12  retail -- like the issue of "prior course of dealing" -- is

13  relevant to determining whether Section § 2 liability

14  applies.  But it appears that the *Trinko* Court considered

15  these facts not for their independent significance, but

16  rather for what they *suggest*:  A willingness to engage in

17  irrational, anticompetitive conduct.

18         The Third Circuit cases to consider the scope of

19  the "no duty to deal" do not appear to adopt a strict

20  requirement that a party must plead "prior course of dealing"

21  for its claims to proceed.  Celgene has not cited a case in

22  the Third Circuit where a motion to dismiss was granted for

23  failure to allege a prior course of dealing.  To the

24  contrary, the cases in our Circuit that have considered the

25  scope of the affirmative duty to deal suggest that a "prior

1  course of dealing" is relevant but not dispositive in

2  determining whether such a duty applies.

3         In *BroadCom Corp. V. Qualcomm Incorp.*, 501 F.3d 297

4  (3d Cir. 2007), the Third Circuit determined that the limited

5  exception to the "no duty to deal" rule applied even though

6  the plaintiff did not plead a prior course of dealing.

7  (Footnote 1) *Id.* At 316.  The Third Circuit explained that

8  the Supreme Court "created an exception to this [no duty to

9  deal] rule by holding that the decision of a defendant who

10 possessed monopoly power to terminate a voluntary agreement

11 with a small rival *evidenced* the defendant's willingness to

12 forego short-run profits for anticompetitive purposes." *Id.*

13 At 316 (citing *Aspen Skiing*, 472 U.S. at 610-611) (emphasis

14 added).  Though the plaintiff in *BroadCom* did not allege a

15 prior course of dealing, the Third Circuit found that there

16 was other anticompetitive conduct that distinguished the

17 facts from *Trinko* and aligned it more closely with *Aspen

18 Skiing*.(Footnote 2) *Id.*

19         For example, the defendant, QualComm, marketed the

20 allegedly withheld technology for inclusion in an

21 industry-wide standard and voluntarily agreed to license it

22 on certain terms. *Id.*  Thus, under *BroadCom*, a prior course

23 of dealing is relevant as "evidence[] of the defendant's

24 willingness to forego short-term profits for anticompetitive

25 purposes," but where other such evidence exists, the failure

to plead prior dealing is not a death knell. *Id.*

Likewise, the district court cases in our Circuit do not appear to require pleading a prior course of dealing. Perhaps most significantly, two courts in the District of New Jersey have denied motions to dismiss on facts similar to those currently before the Court. *Actelion Pharm. Ltd. V. Apotex, Inc.*, No. 12-5743, D.E. No. 90 (D.N.J. Oct. 21, 2013) (denying motion for judgment on the pleadings "for reasons stated during oral argument"); *Lannett Co., Inc. V. Celgene Corp.*, No. 8-3920, D.E. No. 42 (E.D. Pa. Mar. 30, 2011) (denying motion to dismiss without comment). (Footnote 3)

In *Actelion*, as here, a branded pharmaceutical manufacturer refused to sell samples of a product distributed pursuant to a REMS program to its generic competitor.  Also as here, the defendant argued that the plaintiff's claims should be dismissed for failing to allege a prior course of dealing between the parties.  Judge Hillman ruled during oral argument that the § 2 claims could proceed, noting that "if the defendants can prove that the plaintiffs are motivated not so much by safety concerns but instead motivated by the desire to use the REMS or REMS equivalent, to use exclusive distribution agreements and to use a otherwise legitimate refusal to deal together to maintain and extend a monopoly, then they may very well make out a Section 2 claim." *Id.* at *117.  Judge Hillman also noted that facts other than prior*

1    *course of dealing—such as the "refusal to sell at retail" and*
2    *attempt to control prices—were evidence of anticompetitive*
3    *conduct in Aspen Skiing* and, accordingly, determinative of
4    its outcome. *Id.* at 13-14. Accordingly, the fact that the
5    plaintiff in *Actelion* did not plead a prior course of dealing
6    did not automatically preclude a § 2 claim because it pled
7    other facts to demonstrate that the defendant's actions were
8    motivated only by long-term anticompetitive gain.
9    Most recently, the Eastern District of Pennsylvania had the
10   opportunity to address the scope of an affirmative duty to
11   deal in *In re Suboxone (Buprenorphine Hydrochloride and*
12   *Naloxone) Antitrust Litigation*, No. 13-2445, D.E. No. 97
13   (E.D. Pa. Dec. 3, 2014).  There, the court held that the
14   exception described in *Aspen Skiing* did not apply because
15   there was no prior course of dealing between the parties.
16   However, *Suboxone* is distinguishable from this case because
17   it did not consider whether facts other than prior dealing
18   demonstrated the defendant's willingness to forego short-term
19   profits for anticompetitive gain.  In fact, the *Suboxone*
20   court recognized that "*Lannett* and *Actelion* are
21   distinguishable because the elements to assure safe use in
22   those cases prevented the generics from obtaining the
23   brand-name pharmaceutical to conduct bio equivalency testing
24   during the REMS process." *Id.* At 28. The *Suboxone* court would
25   have been aware that the plaintiffs in *Lannett* and *Actelion*

1    did not plead a prior course of dealing, and therefore

2    recognizes that other facts in those cases (and this one) may

3    give rise to § 2 liability.

4           To be sure, there are cases that weigh "prior

5    course of dealing" more heavily.  For example, the Second

6    Circuit has dismissed § 2 claims for failing to allege a

7    prior course of dealing between the parties. *In Re Elevator*

8    *Antitrust Litig.*, 502 F.3d 47, 53 (2007).  In reaching

9    its decision, the Second Circuit relied on the Supreme

10   Court's reasoning that the "unilateral termination of a

11   voluntary (*and thus presumably profitable*) course of dealing

12   suggested a willingness to forsake short-term profits to

13   achieve an anticompetitive end." *Id.* (Quoting *Trinko*, 540

14   U.S. at 409) (emphasis in original).  Thus, even though *In Re*

15   *Elevator* dismissed claims for failing to allege prior

16   dealing, its focus was still on the willingness to forsake

17   short-term profits for an anticompetitive end.  It does not

18   address whether other factors could also indicate such a

19   willingness.

20          Indeed, the Supreme Court has "never held that

21   termination of a preexisting course of dealing is a necessary

22   element of an antitrust claim," *Helicopter Transport Servs.,*

23   *Inc. V. Erickson Air-Crane, Inc.*, No. 7-3077, 2008 WL 151833,

24   at *9 (D. Or. Jan. 14, 2008), and there remains valid Supreme

25   Court law imposing an affirmative duty to deal when no prior

course of dealing was alleged. *Otter Tail Power Co. V. United States*, 410 U.S. 366 (1973).  There, the defendant was "in the business of providing a service to certain customers (power transmission over its network), and refused to provide the same service to certain other customers." *Trinko*, 540 U.S. at 410 (citing *Otter Tail*, 410 U.S. at 371, 377-78).  In this way, the facts in *Otter Tail* align with the facts before this Court—there is no prior course of dealing between the parties themselves, but there was prior business between Celgene and other generic companies and research organizations.  The Supreme Court's finding of an affirmative duty in *Otter Tail* (as well as its discussion of that case in *Trinko* without overruling it) lends further support to Mylan's argument that a prior course of dealing is not required.

Here, Mylan essentially admits that it has not plead a prior course of dealing between the parties. Nevertheless, the Court finds that Mylan's Complaint pleads facts that, if true, may give rise to a plausible § 2 claim. To start, Mylan has pled that there is no legitimate business reason for Celgene's actions, which it argues are solely motivated by its goal to obtain long-term anticompetitive gain. (*See, e.g.*, Compl. ¶¶ 158-170).

It has further pled that Celgene has sold samples of Thalomid and Revlimid at retail and provided it to

research organizations, but refuses to sell to Mylan because of its anticompetitive goals. *Id.* Though Celgene vigorously disputes these allegations, the Court finds that Mylan's pleadings are sufficient to allow the case to proceed to discovery, especially because the Court's inquiry at this stage does not require any probability of success.  The Court is convinced that Mylan has pled its § 2 claims with sufficient detail to justify moving the case beyond the pleadings to the next stage of litigation.

### b. SECTION § 1 CLAIMS

Mylan's § 1 claim alleges that Celgene devised an anticompetitive scheme to prevent Mylan and others from filing ANDAs for generic versions of Thalomid and Revlimid, and that Celgene entered into unlawful agreements with wholesale distributors and pharmacies to unduly restrain trade.

A plaintiff asserting a Section 1 claim must assert four elements: (1) a concerted action by defendants (2) that produced anti-competitive effects within the relevant product and geographic markets; (3) that the concerted actions were illegal; and (4) that plaintiff was injured as a proximate result of the concerted action. *Howard Hess Dental Labs. Inc. V. Dentsply Intern., Inc.*, 602 F.3d 237, 253 (3d Cir. 2010). Here, Celgene challenges that Mylan has adequately pled elements (1) and (4)--concerted action and proximate

1   causation.  The Court finds that Mylan has not adequately

2   pled a concerted action between Celgene and its alleged

3   coconspirators and therefore grants Celgene's motion to

4   dismiss Mylan's § 1 claims.  Because the Court dismisses

5   these claims based on failure to plead concerted action, it

6   does not need to reach whether proximate causation is

7   present.

8         "The essence of a Section 1 claim is the existence

9   of an agreement." *Gordon v. Lewiston Hosp.*, 423 F.3d 184, 207

10  (3d Cir. 2005) (citing *Mathews v. Lancaster Gen'l Hosp.*, 87

11  F.3d 624, 639 (3d Cir. 1996).  Unilateral action does not

12  support Section 1 liability.  Rather, there must be a "unity

13  of purpose or a common design and understanding or meeting of

14  the minds in an unlawful arrangement." *Siegel Transfer, Inc.*

15  *V. Carrier Express*, Inc., 54 F.3d 1125, 1131 (3d Cir. 1995)

16  (quoting *Copperweld Corp. V. Independent Tube Corp.*, 467 U.S.

17  752, 771 (1984)).  To establish concerted action, there must

18  be a "relationship between pressure from one conspirator and

19  the anticompetitive decision of another conspirator." *Gordon*,

20  423 F.3d at 207 (citing *Big Apple BMW v. BMW of North*

21  *America*, 974 F.2d 1358, 1363 (3d Cir. 1992).

22        Celgene argues that Mylan has merely alleged the

23  existence of agreements with agents and servicing entities

24  that have no competitive interest in the market, no interest

25  in harming Mylan, and no knowledge of Mylan's anticompetitive

1    objective. (Br. at 25-27). Celgene argues that these

2    allegations cannot give rise to a § 1 claim. (*Id.* At 26). It

3    adds that, to meet the § 1 pleading requirements, Mylan must

4    allege that independent actors agreed to a common plan or

5    scheme. (D.E. No. 31 ("Rep. Br.") at 17).(Footnote 4)

6           Mylan responds that Celgene's purported pleading

7    burden is too high. It states that it has discharged its

8    pleading burden by "directly alleging the existence of

9    restrictive distribution contracts between Celgene and

10   downstream entities," (Opp. Br. At 29), and that "unity of

11   purpose is not required" in pleading a § 1 claim. (December

12   9, 2014 Hearing Transcript ("Tr.") at 69).

13          Mylan's argument that it does not need to plead any

14   unity of purpose relies on *Fineman v. Armstrong World Indus.,*

15   *Inc.*, 980 F.2d 171 (3d Cir. 1992). In *Fineman*, the Third

16   Circuit reversed a directed verdict on the Plaintiff's § 1

17   claim, which the district court granted after "determining

18   that 'under no set of circumstances based on this record

19   could the jury reasonably find that Stern shared Armstrong's

20   purpose of eliminating TINS from competition in the video

21   magazine market.'" *Id.* At 212. The Third Circuit found the

22   district court's approach "misplaced as it renders section 1

23   claims unavailable to private litigants suffering antitrust

24   injury as a result of concerted action in a vertical matrix."

25   Instead of requiring that the coconspirators share a *motive*,

1   the Third Circuit held that "the emphasis is on the

2   participant's '*commitment to [the] scheme* [which is] designed

3   to achieve an unlawful purpose*." Id.* (Quoting *Edward J.*

4   *Sweeny*, 637 F.2d at 111) (emphasis in original). It further

5   held that a "rational factfinder could infer commitment to

6   the scheme among coconspirators "despite differing motives."

7   *Id.*

8           The Third Circuit in *Fineman* thus discharged the

9   requirement that a plaintiff must plead an identical motive

10  among co-conspirators perpetuating a restraint on trade. This

11  is logical given that, in an alleged vertical conspiracy, the

12  interests of the coconspirators are different by nature—in

13  fact, the Third Circuit noted that it "cannot conceive of a

14  situation in which vertically aligned co-conspirators seeking

15  to destroy a competitor of only one could satisfy this

16  requirement [of identical motive]." *Id.* At 213.

17          Yet the Court in *Fineman* did *not* eliminate the

18  requirement that a plaintiff alleging a § 1 violation must

19  plead an agreement to a common scheme or design—regardless of

20  each coconspirator's motive for agreeing to it.  In fact,

21  Third Circuit in *Fineman* reiterated the key factors for § 1

22  liability articulated by it earlier in *Harold Friedman v.*

23  *Thorofare Markets, Inc.*, 587 F.2d 127, 143 (3d Cir. 1978).

24  There, the Third Circuit held that "knowledge of the

25  defendant's purpose to restrain trade is an important factor"

and "at least two members of the combination stood to benefit by the restraint of trade . . . Thus, in a sense, two members of the combination shared a common purpose insofar as they both benefited from the restraint of trade." *Id.* In *Fineman*, the Third Circuit found that both of these factors were present—the alleged conspirators had knowledge of the anticompetitive goal and stood to benefit from it, giving rise to a plausible § 1 violation. *Fineman*, 980 F.3d at 214. *Fineman* may fairly be read to hold plaintiff does not need to plead that § 1 coconspirators share a common motive, but it does not support Mylan's argument that a § 1 plaintiff does not need to plead any agreement to a common plan or scheme whatsoever. (FOOTNOTE 5)

The Third Circuit reaffirmed the § 1 pleading standard in *Siegel Transfer, Inc. V. Carrier Express, Inc.*, 54 F.3d 1125 (3d Cir. 1995), in which the Circuit held that there was no § 1 violation because the alleged coconspirators were "[c]ontractually obligated to manage Carrier Express affairs" and represented a single enterprise." *Siegel Transfer, Inc. V. Carrier Express, Inc.*, 54 F.3d 1125, 1135 (3d Cir. 1995). As such, they were not capable of conspiracy. *Id.* Third Circuit reiterated that § 1 liability requires a "unity of purpose or a common design and understanding or meeting of the minds in an unlawful arrangement." *Id.* At 1131 (quoting *Copperweld Corp. V.*

1    *Independent Tube Corp.*, 467 U.S. 752, 771 (1984)).

2    The most recent case that Mylan relies on, *West Penn*, also

3    fails to support the sufficiency of its pleadings. Mylan

4    cites *West Penn* for the proposition that "[i]f a complaint

5    includes non-conclusory allegations of direct evidence of an

6    agreement, a court need go no further on the question whether

7    an agreement has been adequately pled." *West Penn*, 627 F.3d

8    at 99. Yet Mylan ignores *West Penn*'s explicit definition of

9    an "agreement," which is "a unity of purpose, a common design

10   and understanding, a meeting of the minds, or a conscious

11   commitment to a common scheme." *Id.* (Citing *Copperweld*, 467

12   U.S. at 771).

13        For example, in *West* Penn, the Plaintiff

14   specifically alleged that the coconspirators ". . . Formed an

15   agreement to protect one another from competition. Plaintiff

16   asserts that UPMC agreed to use its power in the provider

17   market to exclude Highmark's rivals from the Allegheny health

18   insurance market, and that in exchange Highmark agreed to

19   take steps to strengthen UPMC and to weaken its primary

20   rival, West Penn." *Id.* At 100.

21        Thus, while a contract may be an "agreement"

22   pursuant to § 1 if there is evidence that it represents a

23   unity of purpose, meeting of the minds, or conscious

24   commitment to a common scheme, Mylan has not pointed to any

25   case holding that it is enough to simply plead that a

1 contract exists. In fact, the Third Circuit has held that

2 there is no agreement under § 1 "when a party has simply

3 entered into a permissible contract with the defendant or

4 when the defendant has enforced a contractual right with

5 another party." *Friedman, Inc. V. Kroger Co.*, 581 F.2d 1068,

6 1078 (3d Cir. 1978). Mylan appears to conflate evidence of a

7 *contract* with evidence of an unlawful "agreement" to restrain

8 trade under § 1.

9            Here, the Court finds that Mylan's Complaint fails

10 to assert non-conclusory allegations of an unlawful agreement

11 between Celgene and its distributors or competitors that

12 would give rise to § 1 liability. In fact, the only

13 paragraphs in the Complaint that Mylan points to as

14 supporting its allegations of a common scheme are ¶¶ 261,

15 262, 274, and 275. (Tr. At 100).  Those paragraphs allege

16 that *Celgene* devised an anticompetitive scheme to prevent

17 Mylan and others from entering the markets for Thalomid and

18 Revlimid, and that *Celgene* entered into unlawful

19 agreements to restrict distribution of those products. *Id.*

20 Nowhere does Mylan plead that Celgene's distributors and

21 pharmacists shared its purpose (even if they had different

22 motives for doing so), or that they had a common

23 anticompetitive goal.  For example, there are no allegations

24 that Celgene's pharmacists or distributors stood to benefit

25 from the alleged anticompetitive scheme.  *See Friedman*, 980

1 F. 2d at 1073. Nor does the Complaint allege that Celgene's

2 distributors and pharmacists even had *knowledge* of Celgene's

3 anticompetitive intent. *Id.* ("[K]knowledge of the defendant's

4 purpose to restrain trade is an important factor.").

5    Finally, the Court further finds that Mylan has not

6 even alleged that the purpose of the agreements between

7 Celgene and its distributors was to unduly restrain commerce.

8 Third Circuit has held that "contractual restraints fall

9 within the prohibition of Section 1 only when their purpose

10 and effect is found to have imposed an undue restraint on

11 commerce." *Garhman v. Univ. Res. Holding, Inc.*, 641 F. Supp.

12 135, 1371 (D.N.J. 1986) (quoting *Sitkin Smelting v. FMC*

13 *Corp.*, 575 F.2d 440, 447 (3d Cir. 1978). Thus, even if

14 evidence of the contracts was sufficient to constitute an

15 "agreement" under § 1, any restraint of trade appears to be

16 collateral to the main purpose of the contracts, which is to

17 distribute Revlimid and Thalomid pursuant to Celgene's REMS

18 programs. Mylan has not alleged that the restraint of trade

19 is a central purpose of the agreements between Mylan and its

20 distributors and pharmacies. *See generally Friedman v.*

21 *Kroger*, 581 F.2d at 1073; *Fineman*, 980 F.3d at 213.

22 Based on all of the above, the Complaint fails to "raise a

23 reasonable expectation that discovery will reveal evidence of

24 [an] illegal agreement," *Twombly*, 550 U.S. at 556, and

25 Mylan's claims under § 1 of the Sherman Act must be

1    dismissed.  The Court does not need to independently consider

2    Celgene's "causation" element because it finds that Mylan

3    failed to adequately plead concerted action.

4                    **c. Statute of Limitations**

5            The parties agree that a four-year statute of

6    limitations applies to Mylan's claims in this case. 15 U.S.C.

7    § 15(b).  The statute of limitations runs from when the

8    plaintiff allegedly becomes injured by the defendant. The

9    Court finds that this statute of limitations does not bar

10   Mylan's claims as to Thalomid or its claims that rely on both

11   Thalomid and Revlimid.

12           As an initial matter, the Court finds that Mylan

13   adequately pled that Celgene refused samples within the

14   limitations period: "Throughout this entire period, Celgene

15   has engaged in a scheme (described at length below) to

16   continuously prevent and/or stall all of Mylan's efforts to

17   obtain samples of Thalomid and Revlimid." (Compl. ¶ 7).

18   In addition, the Court finds that Mylan has pled that

19   Celgene's continued refusal to deal throughout the

20   limitations period constitutes an injurious act. *In re Lower*

21   *Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144, 1172 (3d

22   Cir. 1993), held that "continuing and accumulating damage may

23   result from intentional, concerted inaction.  The purposeful

24   nature of the inaction—here an ongoing refusal to sell or

25   lease—obviously constitutes an injurious act, although

1    perhaps not an overt one in the commonly-understood sense."

2    It further held that: "[A] conspiracy's refusal to deal,

3    which began outside the limitations period, may be viewed as

4    a continuing series of acts upon which successive causes of

5    actions may accrue.  Far from requiring that the plaintiff

6    tie its damages to specific acts, the [Fifth Circuit]

7    acknowledged that a continuing conspiracy may give rise to

8    continually accruing rights of action, and the court simply

9    required the plaintiff to support its allegation that the

10   defendant had continued during the period in suit to refuse

11   to deal." *Id.* At 1173 (internal quotations and citations

12   omitted).

13          In *West Penn*, the Third Circuit reaffirmed that

14   holding, and declined to time-bar claims on the grounds that

15   the actions alleged to have occurred within the limitations

16   period were "merely 'reaffirmations' of acts done or

17   decisions made outside of the limitations period." *West Penn*,

18   627 F.2d at 106.  There the Court held that the Defendant's

19   argument would mean that "a plaintiff who suffers [damage

20   from a continuing antitrust violation] is barred not only

21   from proving violations and damages more than four years old,

22   but is barred forever from complaining of [the continuation]

23   of the unlawful conduct." *Id.* At 108 (internal quotations and

24   citations omitted).

25          The Court finds this reasoning applicable here.

1    Celgene's continued refusal to deal constitutes an overtly

2    injurious act that has occurred within the four-year

3    limitations period. As a result, the Court will not bar

4    Mylan's claims based on the applicable statute of

5    limitations.

6                    **d. Relevant Market**

7             Defining the "relevant market" for purposes of a

8    monopoly is a necessary element of any antitrust claim,

9    whether under § 1 or § 2. The scope of an antitrust product

10   market is determined by the "reasonable interchangeability of

11   use or the cross-elasticity of demand between the product

12   itself and the substitutes for it." *Brown Shoe Co. V. United*

13   *States*, 370 F.2d 20, 26 (3d Cir. 1978).

14            "In most cases, the proper market definition can

15   only be determined after a factual inquiry into the

16   commercial realities faced by consumers." *Queen City Pizza v.*

17   *Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997). As

18   such, courts typically decline to dismiss antitrust claims

19   based on failure to plead the relevant market. That said,

20   there is no *per se* rule prohibiting dismissal on this cases,

21   and plaintiffs have the burden of defining the relevant

22   market. "Cases in which dismissal on the pleadings is

23   appropriate frequently involve either (1) failed attempts to

24   limit a product market to a single brand, franchise,

25   institution, or comparable entity that competes with

1   potential substitutes, or (2) failure even to attempt a

2   plausible explanation as to why a market should be limited in

3   a particular way." *Todd v. Exxon Corp.*, 275 F.3d 191, 200 (2d

4   Cir. 2001).

5           Mylan has pled that the relevant market "in which

6   to assess the anticompetitive effects of Celgene's conduct"

7   concerning Thalomid and Revlimid is the market for each

8   product plus bioequivalent generic versions. (Compl. ¶¶ 36,

9   46). Celgene argues that Mylan's single-market pleading is

10  legally deficient, and that Mylan fails to explain why the

11  market should be limited in this way. (Moving Br. At 30-36).

12  Celgene is correct that courts are skeptical of

13  single-product market definitions. *See, e.g., Am. Sales Co.,*

14  *Inc. V. Astrazeneca AB*, No. 10-6062, 2011 WL 1465786

15  (S.D.N.Y. Apr. 14, 2011) (rejecting market consisting solely

16  of pharmaceutical product and its generic counterpart). Here,

17  however, the Court declines to find Mylan's market definition

18  legally insufficient on its face because there are factual

19  questions that must be resolved. For example, it specifically

20  alleged that the availability of other treatments for the

21  indications that Thalomid and Revlimid are prescribed are not

22  sufficient to prevent the anticompetitive effects of

23  Celgene's conduct. (Compl. ¶¶ 37, 47).

24          Discovery is needed to determine, among other

25  things, whether these allegations are true or whether, as

1  Celgene contends, other products serve as adequate market

2  substitutes. (*See* Rep. Br. At 20-23).

3           Based on the above, the Court declines to dismiss

4  Mylan's claims based on a failure to allege the relevant

5  market.

6           **e. No Injury**

7           Injury is a necessary element of any antitrust

8  claim. 15 U.S.C. §§ 15, 26. Celgene argues that Mylan has

9  failed to allege an injury because it has not shown that it

10 would be able to enter the market with generic versions of

11 the products at issue. (Moving Br. At 36-37).  The Court

12 disagrees.

13          Though Celgene is correct that there are barriers

14 to Mylan entering the market with generic versions of

15 Thalomid and Revlimid, the bar is not absolute. For example,

16 Mylan could argue that Celgene's patents are invalid or

17 attempt to enter the market with a product that it alleges in

18 noninfringing.  In addition, Mylan is injured by Celgene's

19 preventing it from entering the market immediately upon the

20 expiration of its patents. In sum, the Court denies Celgene's

21 motion to dismiss Mylan's claims for failure to assert an

22 injury.

23          **f. Conclusion**

24          For the reasons above, the Court grants Celgene's

25 motions to dismiss *without prejudice* for Mylan's claims under

1   § 1 of the Sherman Act, counts 5-7, as well as the portions

2   of Mylan's New Jersey Antitrust Act claims, counts 8 and 9,

3   arising under Section 56:9-3. The Court denies Celgene's

4   motion to dismiss with respect to the remaining counts.

5            SO ORDERED this 22nd day of December, 2014.

6

7

8                      (Adjourned)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                           FOOTNOTES

3

4        FOOTNOTE 1.  The Third Circuit acknowledged that

5    though *BroadCom* was not a strict "refusal to deal case," if

6    it "were to analyze it as such, [it] would find that the

7    Complaint does not run afoul of established Supreme Court

8    precedent" because the limited exception to the "no duty to

9    deal" rule applied. *BroadCom*, 501 F.3d at 316.

10       FOOTNOTE 2.  At oral argument, Counsel for Celgene

11   argued that there was a "current relationship" between the

12   parties in *BroadCom* because "Broadcom had already committed

13   the license on FRAND terms." (Tr. At 34). However, it does

14   not appear that Broadcom and Qualcomm ever reached a license

15   agreement. Rather "Broadcom claims to have been preparing to

16   enter the UMTS chipset market for several years . . . [And]

17   Qualcomm allegedly demanded that Broadcom license Qualcomm's

18   UMTS technology to non-FRAND terms. Broadcom refused, and

19   commenced this action." *Broadcom*, 501 F.3d at 305. The Court

20   does not agree that this constitutes a prior course of

21   dealing between the parties as contemplated in *Aspen Skiing*

22   and *Trinko*.

23       FOOTNOTE 3.  Additionally, in *Only v. Ascent Media*

24   *Grp., LLC*, No. 6-2123, 2006 WL 2865492 (D.N.J. Oct. 5, 2006),

25   the Judge Hochberg noted in a footnote that there are three

"exceptional circumstances where a duty [to deal] may be recognized": First, the *Trinko* court "recognized that a 'concerted' refusal to deal may violate the Sherman Act under its prior decisions." Second, a "sudden refusal to deal on fair terms following a longstanding and mutually profitable business relationship may approach to boundary of Section Two liability." And third, there may be a limited exception when a defendant refuses to make available access to "essential facilities." *Id.* At *4 n.7. Therefore, at least one court in this Circuit has noted that a "concerted" refusal to deal may constitute an exception separate and apart from a prior course of dealing. *Id.*

FOOTNOTE 4. There is also an implication in Celgene's briefs that vertical agreements between manufacturers and distributors, such as those alleged here, are not suitable for § 1 claims. The Court notes that these types of agreements may give rise to such claims when adequately pled. *See, e.g., United States v. Ciba Geigy Corp.*, 508 F. Supp. 1118, 1146 (D.N.J. 1976) ("Although these contracts were reached in a vertical, supplier-purchaser, context, they, in fact, were designed to limit horizontal competition . . . . Such agreements are more pernicious antitrust violations than simple vertical restraints. . . .").

FOOTNOTE 5. In fact, the Third Circuit has

1  rejected arguments similar to Mylan's. In *Howard Hess Dental*

2  *Labs. Inc. V. Dentsply Intern., Inc.*, 602 F.2d 237 (3d Cir.

3  2010), plaintiffs attempted to rely on *Fineman* to justify

4  pleadings that "do not offer even a gossamer inference of any

5  degree of coordination . . . ." The Third Circuit wrote that

6  though *Fineman* held that vertically aligned co-conspirators

7  need not share an identical motive, "nothing in that case

8  excuses the Plaintiffs from alleging an agreement. . . ."

9  *Dentsply*, 602 F.3d at 256 n.8.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25