## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| MYLAN PHARMACEUTICALS INC., | ) Civil Action No. 2:14-cv-02094-ES-MAH |
| | ) Hon. Esther Salas, U.S.D.J. |
| Plaintiff, | ) Hon. Michael A. Hammer, U.S.M.J. |
| | ) |
| v. | ) |
| | ) |
| CELGENE CORPORATION, | ) JURY TRIAL DEMANDED |
| | ) |
| Defendant. | ) |
| | ) |

## JOINT DISCOVERY PLAN[1]

**1.      Factual Description of the Case**

**(a)      Plaintiff's Description of the Case**

Plaintiff Mylan Pharmaceuticals, Inc. ("Mylan") sues defendant Celgene Corporation ("Celgene") for violations of federal and state antitrust law.  Celgene has unlawfully maintained monopolies over its two "lead" products—Thalomid and Revlimid—by preventing lower-priced generic competition from entering the market.

Thalomid and Revlimid treat critically ill patients.  Thalomid (the branded version of thalidomide) is indicated for the treatment of debilitating and disfiguring lesions associated with erythema nodosum leprosum ("ENL"), a complication of Hansen's Disease, commonly known as leprosy.  It is also indicated for the treatment of newly diagnosed multiple myeloma patients in combination with the pharmaceutical dexamethasone.  Revlimid (the branded version of

---

[1] Mylan and Celgene had previously submitted a proposed Joint Discovery Plan to Magistrate Judge Hammer on June 2, 2014.

lenalidomide) is indicated for the treatment of a subset of myelodysplastic syndromes ("MDS")—a group of disorders caused by poorly formed or dysfunctional blood cells.

Access to these drugs is restricted.  Because of safety concerns, for both drugs, the FDA conditioned Celgene's approval on the establishment of a Risk Evaluation and Mitigation Strategies ("REMS") program to ensure that there were appropriate safeguards for the use and distribution of these drugs.  To meet these requirements, Celgene developed a restricted distribution program for Thalomid, known as the System for Thalidomide Education and Prescribing Safety ("S.T.E.P.S.").  Similarly, for Revlimid, Celgene developed a REMS program called RevAssist.  In the legislation mandating the implementation of REMS programs for certain drugs, including Thalomid and Revlimid, Congress made clear that such programs were *not* to be used by branded drug makers as a tool to keep generic competitors out of the market. See Food Drug and Cosmetic Act §505-1(f)(8) (21 U.S.C. § 355-1).

Under the Hatch-Waxman Act (a statutory scheme designed, in part, to encourage generic competition), a generic drug manufacturer can seek FDA approval for a generic version of a branded drug product by filing an Abbreviated New Drug Application ("ANDA").  Through the ANDA filing, a generic drug maker must demonstrate bioequivalence to the reference listed branded drug ("RLD") (i.e., the branded drug to which the generic will be bioequivalent). Ordinarily, a generic manufacturer can obtain the necessary samples of the RLD for bioequivalence testing through normal distribution channels (*i.e.*, a wholesaler) simply by purchasing a sufficient quantity of the drug at market price.  However, a generic firm like Mylan may not do so for Thalomid and Revlimid because of the respective REMS programs for these drugs.

Celgene has used its REMS programs as a pretext to prevent Mylan from acquiring the necessary samples to conduct bioequivalence studies, even after the FDA determined that Mylan's safety protocols were acceptable to conduct those studies.  Celgene has refused, on numerous occasions and using a variety of tactics, to provide Mylan with samples of Thalomid and Revlimid necessary to perform bioequivalence studies.  The effect of Celgene's conduct is that Mylan has not been able to bring generic versions of Thalomid or Revlimid to market.  As such, Mylan brings this suit alleging that Celgene has violated both Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, as well as the New Jersey Antitrust Act Section 56, N.J. Stat. Ann. §§ 56:9-3 and 56:9-4.  Additionally, Mylan alleges that that the defendant has engaged in unfair competition and has tortiously interfered with Mylan's economic advantage, in violation of the common law of the State of New Jersey.  Mylan seeks damages, a preliminary and permanent injunction and a declaratory judgment.

Mylan filed its Complaint on April 3, 2014, and Celgene moved to dismiss Mylan's complaint on May 25, 2014.  On December 23, 2014, Judge Salas denied Celgene's motion to dismiss on counts 1-4 (Mylan's Sherman Act, Section 2 claims) and 8-17 (Mylan's state law and declaratory judgment claims) of Mylan's complaint.[2]  As Mylan has alleged that Celgene's refusal to provide samples was not motivated by safety concerns, but instead by a desire to prevent generic competition in order to maintain and extend its Thalomid and Revlimid monopolies, Judge Salas found that "Mylan has pled facts that may plausibly give rise to a duty to deal" under Section 2 of the Sherman Act.  Dkt. 56 at 9.  As a result of Judge Salas's decision, Mylan asks for an immediate commencement of discovery.

---

[2] Judge Salas granted Celgene's motion to dismiss on counts 5-7 (Mylan's Sherman Act, Section 1 claims) and portions of counts 8-9 (Mylan's New Jersey Antitrust Act, Section 56:9-3 claims) (contracts and combinations in restraint of trade).

**(b)     Defendant's Description of the Case**

The Court's decision granting in part and denying in part Celgene's motion to dismiss Mylan's complaint has changed the nature and scope of appropriate discovery.   Mylan originally alleged violations of both Sections 1 and 2 of the Sherman Act and related state-law claims. However, recognizing that Mylan failed to state a claim arising from the agreements between Celgene and its distributors, this Court dismissed Mylan's Section 1 claims and related state law claims on December 23, 2014.  Thus, the only remaining claims focus on whether Celgene's *unilateral* refusal to sell samples of Thalomid® and Revlimid® to Mylan on the terms Mylan has demanded constitutes monopolization in violation of the antitrust laws.  The key inquiry in this regard will be whether there were objectively valid business reasons for Celgene's refusal to sell Thalomid® and Revlimid® to Mylan unless and until Mylan provides sufficient information to satisfy Celgene that the samples would be handled and administered in a safe manner and that Celgene would be adequately indemnified for liability resulting from of any mishandling of, unintended exposure to, or other adverse consequences from the drugs.

Although it has no legal obligation to do so, Celgene has been, and remains, willing to sell Thalomid® and Revlimid® samples to Mylan.  All Mylan needs to do is satisfy Celgene's safety, business reputation, and liability concerns.  When other generic companies have satisfied those concerns, Celgene has sold the samples Mylan seeks.  Nonetheless, Mylan insists that it is special and should not be required to do what those other generic companies have done.  For example, Mylan has refused to provide Celgene its protocol for performing the bioequivalence studies necessary to obtain FDA approval of a generic drug product, which would explain in detail how Mylan will handle and use the drug samples it seeks from Celgene.  Nor will Mylan provide copies of the informed consent forms that it plans to use with the bioequivalence testing

4

subjects to inform them of the serious risks associated with Thalomid® and Revlimid® and the steps the subjects must take to prevent fetal exposure.  In addition to refusing to provide this basic information about how the drugs will be handled and administered, Mylan also refuses to provide Celgene with the information necessary for Celgene to assure itself that Celgene will be protected from liability resulting from of any mishandling of, unintended exposure to, or other adverse consequences from the drugs.  For example, Mylan refuses to provide copies of its insurance policies showing the breadth and depth of its insurance coverage.

Celgene has a genuine need for this information, which other generic companies seeking Thalomid® and Revlimid® samples have provided.  Though Mylan's complaint carefully omits any explanation of why the FDA has restricted the distribution of these two life-extending drugs, their risks are well known.  The FDA-approved label for Thalomid® warns that "[e]ven a single dose . . . can cause severe birth defects."  Likewise, Revlimid®'s label cautions that "it may cause birth defects or embryo-fetal death."  The risks to fetuses, in particular, demonstrates why Mylan's assurances regarding indemnification are not sufficient.  Any mishandling of, unintended exposure to, or other adverse consequences from the drugs (whether during a bioequivalency study or after a generic approval) would expose Celgene to reputational harm and the potential loss of its entire market if the FDA forces withdrawal of the drugs.  Moreover, some states have held that liability may be imposed on the branded seller of a given drug for injuries caused by a commercialized generic version, even though it was not sold by the brand. Celgene would thus be exposed to up to twenty years of potential products liability suits, given tolling of the statute of limitations during a victim's minority.

2.        **Settlement Discussions**

On June 19, 2014, parties held a settlement conference before Magistrate Judge Hammer without resolution.

3.        **Initial Disclosures**

The parties will exchange information required by Fed. R. Civ. P. 26(a)(1) by no later than February 26, 2015.

4.        **Discovery**:

(a)        **Discovery is needed on the following subjects, including but not limited to**:

(1)        **Plaintiff's Position**

Mylan expects to require fact and/or expert discovery on all issues raised in the Complaint and any Answer and/or Counterclaims, including but not limited to: Thalomid, Revlimid, generic thalidomide and generic lenalidomide (Relevant Products); R&D of Relevant Products; FDA approval of Relevant Products; promotion of Relevant Products; economic and marketing information regarding Relevant Products, such as market-share, revenue and sales, and/or profit projections; product market; effects of generic entry; REMS programs; the provision of Relevant Products by Celgene to third parties; Mylan's efforts to secure samples of Relevant Products; agreements, negotiations and decisions between Celgene and third parties regarding Relevant Products and REMS programs; correspondence between Celgene and the FDA or other government agencies regarding Relevant Products and REMS programs; any FTC investigation or investigation by any other agency, including state Attorneys General offices, into Celgene's conduct as it relates to  Relevant Products or REMS programs; other litigations in

which Celgene has participated, involving similar or identical facts; citizen petitions to the FDA regarding Celgene's conduct as it relates to Relevant Products and REMS programs.  The foregoing list is not exhaustive and without prejudice to Mylan's right to designate additional topics for discovery, which is expressly reserved.

### (2)    Defendant's Position

This is a complicated antitrust matter that will involve extensive discovery from both the defendant and the plaintiff.  For its part, Celgene intends to seek discovery from Mylan regarding, among other things, Mylan's development and planning for generic versions of Thalomid® and Revlimid®, Mylan's analysis of the competitive landscape for Thalomid® and Revlimid®, Mylan's intended risk management measures for its generic versions of Thalomid® and Revlimid®, and other information related to Mylan's ability to enter the market with generic versions of Thalomid® and Revlimid® prior to the expiration of the numerous patents on the drugs.

Additionally, Celgene will seek discovery of information related to the facts and assurances Celgene has sought from Mylan that Mylan has refused to provide, and which are relevant to Mylan's claims that it would have been able to enter the market including:

- copies of the FDA-approved bioequivalence study protocols and all communications with FDA regarding the protocols and Mylan's proposed generic versions of Thalomid® and Revlimid®;

- copies of the informed consents and other written information for study subjects and clinical personnel containing warnings about the risk of and necessary measures to prevent birth defects;

- history of compliance with FDA regulations and any incidents of product loss due to improper handling or tracking for Mylan and the Clinical Research Organization (CRO) that will be conducting the bioequivalence studies for Mylan's proposed generic versions of Thalomid® and Revlimid®;

- Mylan's and its CRO's standard operating procedures (SOPs) for handling hazardous substances, storage and use of teratogenic products, and disaster recovery and reporting adverse events;

- qualifications of the CRO's research personnel;

- Institutional Review Board (IRB) approval of Mylan's bioequivalence study protocols;

- information regarding how Mylan and its CRO will track each capsule of Thalomid® and Revlimid® before, during, and after the bioequivalence studies;

- copies of insurance policies covering exposure to Thalomid® and Revlimid®; and

- information regarding policy limits, self-insured retentions, and any other information necessary to determine the adequacy of Mylan's insurance coverage and Mylan's financial ability to indemnify Celgene for products liability claims relating to Thalomid® and Revlimid®.

Regarding the discovery Mylan will seek from Celgene, Celgene submits that Mylan has identified topics that are not relevant to Mylan's claims, as defined by Mylan's current complaint, both before and after the Court's ruling dismissing some of Mylan's claims.  For example, as this Court recognized at the June 3, 2014 conference, Mylan seeks a "very broad scope of discovery" that is based on a "presumption" that all of the documents produced to the FTC are relevant to this case.  June 3, 2014 Tr. (Dkt. No. 22) at 23-24.  But Mylan provides no basis to assume that all materials relevant to the FTC and related State Attorneys General investigations of Celgene's conduct with respect to Thalomid® and Revlimid® would necessarily be relevant to the conduct alleged in Mylan's Complaint.  The FTC requested extremely broad categories of documents and information from Celgene that is not limited to Thalomid® and Revlimid®.  Moreover, FTC sought information dating back to July 1, 2003, in some cases and to July 1, 1998 in others –well before the conduct at issue in this case occurred. Celgene will raise appropriate objections to Mylan's requests for such information if and when Mylan includes them in its discovery requests pursuant to the Court's scheduling order.

(b)     **Discovery will be conducted as follows**:

(1)     **Plaintiff's Position**

Mylan proposes that discovery should proceed in two stages.  Mylan proposes that the following categories of documents, which are more accessible than other materials and capable of production without significant further collection and review effort, and which may help to focus other discovery efforts, will be produced on an expedited basis, on the terms discussed below ("Stage 1").

### A.     Automatic Production by Defendants

*Materials Produced to the Federal Trade Commission:*  All non-privileged materials submitted to the Federal Trade Commission, in response to subpoenas or voluntarily, as part of the Federal Trade Commission's investigation into Celgene's conduct as it relates to Thalomid and Revlimid and/or REMS programs.  Any deposition or investigational hearing transcripts produced as part of this investigation should also be produced.

*Materials Produced to State Attorneys General:* All non-privileged materials submitted to the Connecticut Attorney General (or any other state Attorney General), in response to requests or voluntarily, as part of any investigation into Celgene's conduct as it relates to Thalomid and Revlimid and/or REMS programs.

*Materials Produced to the Food and Drug Administration:* All non-privileged materials produced to the Food and Drug Administration, either by request or voluntarily, in connection with Celgene's Citizen Petition in September 2007 (Docket No. FDA-2007-P-0113) or in connection with Dr. Reddy's Laboratories, Inc.'s Citizen Petition in June 2008 (Docket No. FDA-2009-P-0266).

*Lannett Litigation Materials:* All non-privileged materials produced by Celgene as part of the lawsuit filed by Lannett Company, Inc. against Celgene in 2008  (Lannett Company, Inc. v. Celgene Corporation, No. 08-3920) (E.D. Pa. filed Aug. 15, 2008).

### B.     Automatic Production by Mylan:

*Materials Produced to the FTC:* All non-privileged documents submitted to the Federal Trade Commission, in response to subpoenas or voluntarily, as part of the Federal Trade Commission's investigation into Celgene's conduct as it relates to Thalomid and Revlimid and/or REMS programs.  Depositions transcripts produced as part of this investigation will also be produced.

### C.     Timing of Phase Productions:

Parties will have substantially completed production of these Stage 1 materials by February 26, 2015.

In Stage 2, Mylan proposes that all remaining discovery will proceed according to the case schedule below.  That schedule provides for, among other things, the substantial completion of the production of documents responsive to all requests for production served on or before March 3, 2015 by no later than June 3, 2015.

Mylan submits that the Court should adopt the following standard for the timing of both Stage 1 and Stage 2 document productions:  Subject to any obligation of the parties to supplement discovery under the Federal Rules or the Rules of this Court, any documents produced by a party after the respective foregoing scheduled dates applicable to those documents (a) must not exceed an insubstantial number of documents (*i.e.*, no more than ten (10) percent), and (b) could not otherwise have been discovered or produced earlier in this case, as

10

demonstrated to the Court by the producing party upon an objection to such

production submitted to the Court by the non-producing party.  The producing party shall not be

permitted to use or otherwise rely upon for any purpose whatsoever in this case any documents

sought to be produced after the respective foregoing scheduled dates applicable to those

documents that exceed an insubstantial number of documents, absent a showing to the Court of

good cause for such belated production and lack of prejudice to adverse parties.  This standard is

without prejudice to the non-producing party's ability to request different and/or additional relief

based upon such conduct by the producing party.

### (2)       Defendant's Position

Celgene proposes that discovery proceed in this case as it would in any other civil case.

That is, the parties shall exchange initial disclosures per Rule 26(a)(1) of the Federal Rules of

Civil Procedure and then proceed to propound document requests and interrogatories pursuant to

Rules 33 and 34.  Mylan has failed to justify engaging in what it calls "phased" discovery

whereby Celgene would produce a substantial number of documents—including the more than

2,000,000 pages produced to the FTC, whether remotely relevant to this case or not—within one

month.  Mylan's unsuccessful request for an expedited "phase" of discovery was made when

Celgene had asked the Court to delay discovery pending resolution of the motion to dismiss, and

it was based on the false assumption that certain documents were available and prepared for

production without significant effort or expense.  The Court wisely refused to order such a

production, and the Court's ruling on the motion to dismiss has eliminated various claims from

the case.  At this point, with a full discovery schedule about to be put into place, the request for

expedited "phased" discovery makes no sense at all.

11

Mylan does not claim that this first phase of document production will expedite the taking of depositions or the filing of dispositive motions, or that it will otherwise shorten the overall discovery period.  Nor does Mylan allege that this initial production will eliminate the need for further document production.  Rather, Mylan envisions a second round of document requests in which it would ask for additional documents.  In fact, Celgene has not produced documents to the FTC since 2011, meaning much of the information is outdated and would have to be updated.  And while Mylan claims that this phased discovery "may help to focus" those document requests, it is hard to imagine how that would be possible given that Mylan proposes that it submit its document requests less than a week after Celgene produces the first phase of documents.

And while Mylan claims that production of these materials would not entail significant further review effort, that is still false.  Indeed, all that Mylan's "phased" discovery approach will accomplish is to require Celgene to engage in multiple rounds of document review and production rather than a single, efficient document review and production process.  First, the documents produced to the FTC were in response to a confidential Civil Investigative Demand far broader than Mylan's complaint even before it was partially dismissed.  Thus, a significant portion of the documents produced during the FTC investigation are  irrelevant to Mylan's claims.  Second, some of the documents and information Celgene produced to the FTC implicate third-party confidentiality, and thus Celgene would have to notify and obtain permission from various third parties to produce those documents and information to Mylan, even on an outside-counsel-only basis.  That review cannot physically occur in 30 days.

Mylan has failed to justify a departure from the ordinary course of discovery initiated with written document requests followed by an opportunity for Celgene to object and respond.

As this Court has recognized, phased discovery even in the case of class certification is "not a foregone conclusion" in this District.  July 17, 2014 Tr. (Dkt. No. 35) at 12.  Indeed, as Celgene has explained, the phased discovery Mylan proposes will unduly burden Celgene by imposing a piecemeal review and production process.  Mylan's counsel has recognized that propounding document requests is another way to effectuate its right to discovery here.  *See* July 17, 2014 Tr. (Dkt. No. 35) at 17 ("If -- if there is a unsurmountable concern around [phased discovery], we also can go another way.  We can go directly into discovery.  If Mr. McDonald wants us to issue an RFP a week from now, we'll do that and we'll commence discovery in the ordinary manner.").  Thus, instead of engaging in such piecemeal discovery, Celgene submits that it would be more efficient for Mylan to serve requests directed to the categories of documents and information relevant to this case.  Celgene will then collect, review, and produce non-privileged documents and data responsive to those requests as part of a single process.

Otherwise, the schedule proposed by Celgene in § 4(e) below is similar in substance to Mylan's proposal.  Given the complicated economic and other issues likely to be present in this case, and the substantial discovery that Celgene will require related not only to Mylan's capacity to meet Celgene's safety and financial concerns, but also to its capacity to develop and market these drugs in a timeframe capable of supporting its claim of injury, Celgene proposes somewhat longer time periods than Mylan proposes.  For example, Celgene proposes twelve months for fact discovery whereas Mylan proposes less than eight months.  Celgene also proposes a slightly longer timetable for expert discovery (six months versus Mylan's four months).  In Celgene's counsel's experience with similar complicated antitrust cases, such deadlines more realistically approximate the amount of time necessary to fully develop the factual record.

(c)        **Number of Interrogatories and Requests for Admission:**

The parties agree that each party may serve a maximum of twenty-five (25) Interrogatories, in accordance with FRCP 33(a)(1).  The parties agree that there should be no limits on the number of requests for admission that any party may serve.

(d)    **Number of Depositions**:

(1)    **Plaintiff's Position**

Both parties may take a total of twenty (20) fact depositions. Notwithstanding the foregoing, the parties reserve the right to seek leave of the Court to increase the number of fact depositions to be taken.  Each Rule 30(b)(6) deposition counts against the per-side fact deposition cap.  Any Rule 30(b)(6) deposition of a named party noticed by Plaintiff or Defendant counts as one (1) deposition no matter the number of witnesses designated to testify, unless the deposition exceeds 7 hours. In the event that a Rule 30(b)(6) deposition exceeds 7 hours, the additional hours shall count as an additional deposition or the pro rata portion of an additional deposition (e.g., if a Rule 30(b)(6) deposition lasts 14 hours, it shall count as 2 depositions out of the 20 party depositions allocated per party; if a Rule 30(b)(6) deposition lasts 10.5 hours, it shall count as 1½ depositions out of the 20 party depositions allocated per party).  Subject to the per-party fact deposition cap, the parties are not precluded from seeking the deposition of a Rule 30(b)(6) designee in their individual capacity.

A non-party deposition will not count as one deposition against the per-party fact deposition cap.

14

### (2)     Defendant's Position

The provisions of Federal Rule of Civil Procedure 30 and the Advisory Committee Notes explaining that Rule should govern depositions.  Mylan's proposal does far more than simply double the number of fact depositions allowed by the rules.  It would make the total number boundless, by providing that third party depositions do not count against the total.  Mylan makes no attempt to show good cause for such a change.

### (e)     Case Schedule

The Parties have not reached agreement concerning the schedule for this case.  Their proposals are set forth below, followed by a brief explanation of their positions.  Further, Mylan proposed to Celgene (and provided copies on May 19, 2014) of a Discovery Confidentiality Order and proposed Electronically Stored Information Protocol.  The parties agree to meet and confer and submit a proposed Discovery Confidentiality Order and Electronically Stored Information Protocol for the Court's consideration.

| Event | Plaintiffs' Proposal | Defendant's Proposal |
|---|---|---|
| Defendant's Answer | January 20, 2015 (by joint stipulation of the parties) | January 20, 2015 (by joint stipulation of the parties) |
| Deadline for submission of proposed Discovery Confidentiality Order and Electronically Stored Information Protocol | February 9, 2015 (two weeks from January 26, 2015 conference with Magistrate Judge Hammer) | February 26, 2015 (30 days from January 26, 2015 conference) |
| Initial Scheduling Conference | On or about February 10, 2015 (if necessary following January 26th conference) | To be scheduled as needed |
| Rule 26(a)(1) Initial Disclosures to be served | February 26, 2015 | February 26, 2015 |

| | | |
|---|---|---|
| Deadline for substantial completion of production of Stage 1 discovery materials | February 26, 2015 | N/A |
| All parties serve first request for production of documents | March 3, 2015 | March 3, 2015 |
| Deadline for substantial completion of production of documents responsive to all Stage 2 requests for production served on or before March 3, 2015 | June 3, 2015 | N/A |
| Fact discovery closes; all discovery requests must be served to be answerable by this date | October 5, 2015 | January 26, 2016 (one year from the conference) |
| Deadline for the party with the burden of proof on an issue serves its expert report(s) on that issue, with the dates for expert depositions to be provided at the time of filing | November 6, 2015 | February 26, 2016 |
| Deadline for the parties to serve responsive expert reports, with the dates for expert depositions to be provided at the time of service | December 7, 2015 | April 29, 2016 |
| Deadline for the parties to serve rebuttal expert reports, with the dates for expert depositions to be provided at the time of service | January 8, 2016 | May 30, 2016 |
| Expert discovery closes | February 8, 2016 | June 30, 2016 |
| Last date to file Rule 56 dispositive motions | March 4, 2016 | August 30, 2016 |
| Final Pretrial Conference | At the Court's convenience, in or about April 2016 | At the Court's convenience, in or about December 2016 |
| Trial | At the Court's convenience, in or about May 2016 | At the Court's convenience, in or about January 2017 |

(f)      **Special Discovery Procedures**:

(1)      The parties have agreed that drafts of expert reports or declarations and notes, written communications, and other types of preliminary work created or generated by or for experts or their staff (unless such notes are generated while testifying) are exempt from discovery.  Communications between and among (a) experts, including their staff, and outside counsel, (b) experts, including their staff, and other experts or consultants and their respective

staff, and/or (c) experts and their respective staff shall not be discoverable unless the expert specifically relied upon any such communications as a basis for any of his or her ultimate opinions or reports. Suggestions from outside counsel regarding revisions to the form of the expert's report or additional support for the expert's ultimate opinions are examples of communications that are protected from discovery under this Order.

    **(2)**   The parties anticipate that a Discovery Confidentiality Order governing the treatment of confidential information will be required and that the Court will be asked to adopt it. The parties agree to meet and confer and submit a proposed Discovery Confidentiality Order for the Court's consideration.

    **(3)**   The parties are prepared to engage in reasonable electronic discovery in response to discovery requests. The parties agree to meet and confer and submit a proposed Electronically Stored Information Protocol for the Court's consideration.

    **(4)**  The Parties agree that, except where infeasible, they shall serve all pleadings, discovery requests, and discovery responses by electronic mail. Service of discovery requests will be deemed to have been made on the day the electronic mail is sent. Service of pleadings and discovery responses will be deemed to have been made on the day electronic mail is sent by the sender, based on the time zone of the District Court.

  **(g)**   **Jury Trial**

    In its Complaint, Mylan demanded a trial by jury pursuant to Rule 38 of the Federal Rules of Civil Procedure.

  **(h)**   **Trial Date**

    To be set by the Court, at its convenience, in or about May 2016, according to Mylan's proposal, or in or about January 2017, according to Celgene's proposal.

**5.**                 **Anticipated Discovery Problems**

No discovery problems are anticipated at this time.

**6.**                 **Special Discovery Needs**

The parties anticipate the need to videotape many, if not all, depositions.

**7.**                 **Expert Testimony**

The Parties expect the expert testimony will be necessary and propose schedules for expert report submissions and responses in § 4(e) above.

**8.**                 **Alternative Dispute Resolution Procedures**

Parties are willing to engage in alternative dispute resolution procedures.  If it appears that voluntary arbitration (pursuant to L. Civ. R. 201.1 or otherwise), mediation (pursuant to L. Civ. R. 301.1 or otherwise), or appointment of a special master would help to facilitate resolution or discussion, both parties may be amenable to submitting to such procedures at an appropriate point in time.

**9.**                 **Bifurcation**

The parties do not believe this case is appropriate for bifurcation.

**10.**                **Trial Conducted by Magistrate Judge**

The parties do not consent to the trial being conducted by a Magistrate Judge.

Dated: January 23, 2015


/s/ Arnold B. Calmann                          /s/ Daniel R. Guadalupe
Arnold B. Calmann                              Daniel R. Guadalupe
(abc@saiber.com)                               (drguadalupe@nmmlaw.com)
Jakob B. Halpern (jbh@saiber.com)              Norris McLaughlin & Marcus, P.A.
SAIBER LLC                                     721 Route 202/206, Suite 200
One Gateway Center                             P.O. Box 5933
10th Floor, Suite 1000                         Bridgewater, NJ 08807
Newark, NJ 07102-5311

Jonathan M. Jacobson
(jjacobson@wsgr.com)
Michael S. Sommer
(msommer@wsgr.com)
Daniel P. Weick (dweick@wsgr.com)
**WILSON SONSINI GOODRICH & ROSATI**
1301 Avenue of the Americas, 40th Floor
New York, NY 10019

Seth C. Silber (ssilber@wsgr.com)
Jonathan R. Lutinski (jlutinski@wsgr.com)
Valentina V. Rucker (vrucker@wsgr.com)
Roisin Comerford (rcomerford@wsgr.com)
**WILSON SONSINI GOODRICH & ROSATI**
1700 K St N.W., 5th Floor
Washington, DC 20006

ATTORNEYS FOR PLAINTIFFS                        ATTORNEYS FOR DEFENDANT
MYLAN PHARMACEUTICALS INC.                      CELGENE CORPORATION