**Not for Publication**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| **MYLAN PHARMACEUTICALS INC.,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | **Civil Action No. 14-2094 (ES)(MAH)** |
| **v.** | : | |
| | : | **OPINION** |
| **CELGENE CORPORATION,** | : | |
| | : | **(filed under temporary seal)** |
| **Defendant.** | : | |
| | : | |

SALAS, DISTRICT JUDGE

## I.   Introduction

A generic pharmaceutical company generally needs samples of a brand-name drug to perform certain studies before seeking U.S. Food and Drug Administration ("FDA") approval to market a generic version of that drug. Put simply, the generic company must show the FDA that its generic version is equivalent to the brand-name drug.

Here, Mylan Pharmaceuticals Inc. ("Mylan") wanted FDA approval to market generic versions of two brand-name drugs marketed by Celgene Corporation ("Celgene")—Thalomid® and Revlimid®. But Mylan says it couldn't get samples of these brand-name drugs. It blames Celgene for this, alleging that Celgene used a certain safety program as pretext to prevent Mylan from getting samples of each drug and conducting the requisite studies. Mylan asserts Celgene did this to improperly stifle generic competition. So Mylan brought this action against Celgene. It claims Celgene's conduct violates federal and state antitrust laws, as well as state laws prohibiting unfair competition and tortious interference.

Celgene has moved for summary judgment to dismiss this action. Its motion raises several issues. Indeed, the Court held lengthy oral argument and ordered supplemental briefing before and after oral argument on certain issues. No doubt this is a complex case. Rather than attempting to preview all of these issues—several of which require necessary background information—the Court provides this brief introduction and addresses each issue below after providing such background.

Based on the below discussion, the Court GRANTS in part and DENIES in part Celgene's motion for summary judgment.

## II.     The Hatch-Waxman Act

### A.     The Hatch–Waxman Act allows a generic company to "piggy-back" on a brand company's FDA approval efforts—which speeds the introduction of low-cost generic drugs to market and thereby furthers competition[1]

The Drug Price Competition and Patent Term Restoration Act of 1984—commonly known as the "Hatch-Waxman Act"—provides a regulatory framework that governs the testing and approval of new drugs. *In re Wellbutrin XL Antitrust Litig.*, 868 F.3d 132, 143 (3d Cir. 2017). This framework is "designed in part to (1) ensure that only rigorously tested pharmaceutical drugs are marketed to the consuming public, (2) incentivize drug manufacturers to invest in new research and development, and (3) encourage generic drug entry into the marketplace." *In re Lipitor Antitrust Litig.*, 868 F.3d 231, 240 (3d Cir. 2017).

A pharmaceutical company that wants to market a new drug must submit a New Drug Application or "NDA" to the FDA. *In re Wellbutrin XL Antitrust Litig.*, 868 F.3d at 143 (quoting *Actavis*, 133 S. Ct. at 2228). "The NDA must include, among other things, a statement of the drug's components, scientific data showing that the drug is safe and effective, and proposed labeling describing the uses for which the drug may be marketed." *Caraco Pharm.*

---

[1]      *See F.T.C. v. Actavis, Inc.*, 133 S. Ct. 2223, 2228 (2013).

*Labs., Ltd. v. Novo Nordisk A/S*, 566 U.S. 399, 404 (2012).  A company that gets FDA approval of its NDA is often referred to as a brand-name company or brand company, and its FDA-approved product is often referred to as a brand-name drug or brand drug.  *See, e.g.*, *F.T.C. v. Actavis, Inc.*, 570 U.S. 136, 142 (2013); *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 643 (2d Cir. 2015).

Conversely, a pharmaceutical company that seeks to market a generic version of a brand drug is often called a generic drug company or generic company, and its generic version of the brand drug is often referred to as a generic drug.  *See, e.g.*, *Mylan Pharm. Inc. v. Warner Chilcott Pub. Ltd. Co.*, 838 F.3d 421, 427-28 (3d Cir. 2016); *Schneiderman*, 787 F.3d at 643 n.3; *Janssen Pharmaceutica, N.V.*, 540 F.3d at 1355-56.

"One of the goals of Hatch-Waxman is to increase competition between generic and brand-name drugs."  *In re Wellbutrin XL Antitrust Litig.*, 868 F.3d at 143.  To that end, the Hatch-Waxman Act allows generic companies to get FDA approval "without having to endure the gauntlet of procedures associated with NDAs."  *Id.*  In particular, a generic company can get similar approval as the brand-name company "by submitting an Abbreviated New Drug Application ('ANDA') that shows that the generic drug has the same active ingredients as, and is biologically equivalent to, the [FDA-approved] brand-name drug."  *In re Lipitor Antitrust Litig.*, 868 F.3d at 240; *see also Caraco*, 566 U.S. at 405 ("Rather than providing independent evidence of safety and efficacy, the typical ANDA shows that the generic drug has the same active ingredients as, and is biologically equivalent to, the brand-name drug.").  "This way, a generic manufacturer does not need to undergo the same costly approval procedures to develop a drug that has already received FDA approval."  *In re Lipitor Antitrust Litig.*, 868 F.3d at 240.

3

"[F]or drugs that work systemically by circulating in the bloodstream after ingestion in the form of a pill or capsule, bioequivalence is typically measured by comparing the rate and extent of absorption of the active ingredients in the blood." *Graceway Pharms., Inc. v. Sebelius*, 783 F. Supp. 2d 104, 107 (D.D.C. 2011). "In other words, two drugs are bioequivalent if they deliver the same amount of the same active ingredient content into a patient's blood stream over the same amount of time." *New York v. Actavis PLC*, 787 F.3d 638, 644 (2d Cir. 2015). Importantly, a generic company must generally obtain samples of a brand name drug to demonstrate bioequivalence to a brand-name drug. *See Natco Pharma Ltd. v. Gilead Scis., Inc.*, No. 14-3247, 2015 WL 5718398, at *1 (D. Minn. Sept. 29, 2015) (citing 21 U.S.C. §§ 355(b)(1)(A), 355(j)(2)(A)).

### B. The Hatch-Waxman Act provides special procedures for identifying and resolving patent disputes between brand and generic companies[2]

The Hatch-Waxman Act sets forth procedures for patent disputes between brand and generic drug companies. *See In re Lipitor Antitrust Litig.*, 868 F.3d at 240. When a brand company submits an NDA, it must file information about its patents with the NDA. *Id.* If approved, the FDA then will list the patents in a publication informally known as the "Orange Book." *Id.* In particular, a brand company must list in the Orange Book any patents relating to the drug's composition or methods of use. *See id.*

Once listed in the Orange Book, a generic company may file an ANDA "if it can certify that its proposed generic drug will not actually violate the brand manufacturer's patents." *Id.* In fact, a generic company must assure the FDA that its ANDA product will not infringe a listed patent because the FDA cannot authorize a generic drug that would infringe a patent. *See id.* at 240-41; *In re Wellbutrin XL Antitrust Litig.*, 868 F.3d at 144. One way for a generic company to

---

[2]   *In re Lipitor Antitrust Litig.*, 868 F.3d at 240.

do so is by certifying that any listed patent is invalid and/or will not be infringed by the manufacture, use, or sale of the ANDA product.  *See In re Lipitor Antitrust Litig.*, 868 F.3d at 240-41; *In re Wellbutrin XL Antitrust Litig.*, 868 F.3d at 144.  This is referred to as a "paragraph IV certification."  *In re Wellbutrin XL Antitrust Litig.*, 868 F.3d at 144.

A paragraph IV certification constitutes an act of infringement and "often 'means provoking litigation' instituted by the brand manufacturer."  *In re Lipitor Antitrust Litig.*, 868 F.3d at 241 (quoting *Caraco*, 566 U.S. at 407).  If the brand company timely sues the generic company for patent infringement, "the FDA must withhold approval of the generic for at least 30 months while the parties litigate the validity or infringement of the patent."  *Id.*; *see also In re Wellbutrin XL Antitrust Litig.*, 868 F.3d at 144 ("[T]he FDA is required to withhold approval of the generic drug for 30 months or until the infringement case is resolved, whichever comes first.").

Notably, to incentivize generic companies to file ANDAs "challenging weak patents, the Hatch-Waxman Act provides that the *first* generic manufacturer to file a paragraph IV certification will enjoy a 180-day exclusivity period" from the first commercial marketing of its drug.  *See In re Lipitor Antitrust Litig.*, 868 F.3d at 241 (emphasis added).  This 180-day exclusivity period bars any other generic drug from competing with the brand-name drug—a potentially lucrative opportunity for an ANDA-filer.  *See id.*

There are at least two important considerations concerning this 180-day exclusivity period:  (1) it "belongs only to the first generic manufacturer to file an ANDA; if the first-ANDA filer forfeits its exclusivity rights, no other generic manufacturer is entitled to it"; and (2) "the brand-name manufacturer is *not* barred from entering the generic market with its own generic

5

version of the drug—a so-called 'authorized generic'—during the 180-day exclusivity period."

*Id.* (emphasis added).[3]

## III.    The FDA's Risk Evaluation and Mitigation Strategy ("REMS")

Under the FDA Amendments Act of 2007, the FDA can require drug manufacturers to implement a REMS for certain drugs.   *See* 21 U.S.C. § 355-1.   "REMS are required risk management plans that use risk minimization strategies beyond the professional labeling to ensure that the benefits of certain prescription drugs outweigh their risks."[4]   A REMS can have elements such as a "Medication Guide or Patient Package Insert" or "Communication Plan."[5]

Another possible element of a REMS is an "ETASU"—which stands for: "Elements to Assure Safe Use."[6]   "ETASU requirements are the most extensive elements of a REMS program" and "are intended to reduce a specific serious risk listed in the labeling of the drug."[7] A REMS with an ETASU may require, for example, that: "[p]rescribers have specific training/experience or special certifications"; "[e]ach patient using the drug be subject to

---

[3]        A note on this second consideration may be helpful for contextual purposes.   "An authorized generic is a generic drug sold by the company who markets the brand name drug (or a third party licensee)."   *Sanofi-Aventis v. Apotex Inc.*, 659 F.3d 1171, 1174-75 (Fed. Cir. 2011) (citation omitted).   The brand company "who holds the approved NDA wants to stave off possible competition from the ANDA applicants (the generic makers)."   *Mylan Pharms., Inc. v. F.D.A*, 454 F.3d 270, 273 (4th Cir. 2006).   And "[o]ne strategy for the NDA holder is to grant a third party a license to sell a generic version of the drug described in the approved NDA."   *Id.*   "The economic benefits of this practice are clear": "an authorized generic appeals to patients because it is sold at a lower price than the branded pioneer drug"—while also appealing to a brand company because it "benefits from sales of the authorized generic even after the patent protecting the [brand] drug has expired."   *Id.*   Indeed, "[b]y selling an authorized generic during the [180-day] exclusivity period enjoyed by the first paragraph IV ANDA applicant," the brand company "prevents that applicant from winning all of the customers who want to switch from the branded drug to a cheaper generic form."   *Id.*

[4]        *See* U. S. FOOD & DRUG ADMIN., *A Brief Overview of Risk Evalutation & Mitigation Strategies (REMS)*, https://www.fda.gov/downloads/AboutFDA/Transparency/Basics/UCM328784.pdf (last visited Oct. 2, 2018).

[5]        *Id.* at 7.

[6]        *Id.*

[7]        *Id.* at 12-13.

monitoring"; and the "[d]rug be dispensed with evidence of safe-use conditions such as laboratory test results."[8]

As noted above, a generic company must typically obtain samples of a brand drug to show bioequivalence to the brand drug for FDA approval. *See, e.g.*, *Natco Pharma*, 2015 WL 5718398, at *1. And Congress included a provision in the FDA Amendments Act of 2007 setting forth the following: "No holder of an approved covered application shall use any element to assure safe use required by the Secretary under this subsection to block or delay approval of an . . . [ANDA]." 21 U.S.C. § 355-1(f)(8)).

## IV.   Celgene's Thalomid® & Revlimid® are both subject to REMS requirements[9]

### A.  Thalomid®

In the 1950s, a drug called thalidomide was marketed and widely prescribed in Europe and other countries as a treatment for morning sickness and nausea. (D.E. No. 228-1, Celgene's Statement of Material Facts ("Celg. SMF") ¶ 2). In the early 1960s, it was discovered that thalidomide causes severe birth defects including: missing legs, arms, feet and hands; spinal cord defects; cleft lip or palate; absent or abnormal external ears; heart, kidney, and genital abnormalities; and abnormal formation of the digestive system. (*Id.* ¶ 3). In fact, a single dose of thalidomide taken during pregnancy can cause these birth defects. (*Id.*). And about 40% of thalidomide victims died within a year of their birth. (*Id.*). So thalidomide was withdrawn from the market in many countries. (*Id.*).

Celgene obtained FDA approval in 1998 to market thalidomide—under the trade name Thalomid®—for treating manifestations of a particular form of leprosy known as erythema nodosum leprosum ("ENL"). (*See* D.E. No. 228-3, Ex. 1). But the FDA indicated that a

---

[8]      *Id.* at 13.

[9]      Unless otherwise noted, citations to statements of facts are undisputed.

restricted distribution program—called a "System for Thalidomide Education and Prescribing Safety" or "S.T.E.P.S."—was an integral part of the approval and a component of the terms of approval. (*Id.*).

In May 2006, the FDA approved the use of Thalomid®—in combination with dexamethasone—for treating newly diagnosed multiple myeloma. (D.E. No. 228-4, Ex. 12; D.E. Nos. 237-21 & 237-22, Ex. P58).

### B. Revlimid®

In April 2005, Celgene sought approval from the FDA to market lenalidomide—an analogue of thalidomide that is more potent and has a better toxicity profile—under the brand name Revlimid®. (D.E. No. 228-8, Ex. 74 & 77; Celg. SMF ¶ 86). Mylan disputes the date of Celgene's NDA for Revlimid®, arguing that evidence shows Celgene's first submission was sent in December 2004, followed by more than thirty additional submissions before Celgene's application was deemed complete and approved. (*See* D.E. No. 237-1 ("Responses to Celg. SMF ¶ 87)). In any event, in December 2005, the FDA approved Revlimid® for treating transfusion dependent anemia due to myelodysplastic syndromes. (D.E. No. 228-8, Ex. 77). Notably, the FDA's approval letter states that approval was under the "RevAssist Risk Minimization Action Plan" or "RiskMAP"—and distribution of the drug is limited as described in the approval letter and in the detailed RevAssist program. (*Id.*)

In June 2006, the FDA approved the use of Revlimid®—in combination with dexamethasone—for treating multiple myeloma in patients who have received at least one prior therapy. (D.E. No. 228-8, Ex. 78).

### C.  The FDA approves Celgene's proposed REMS for each product

In September 2007, Congress enacted a law that, among other things, codified the FDA's risk management program authority under new provisions requiring that REMS programs be implemented for certain pharmaceutical products.  (*See* D.E. No. 238-30, Ex. P315).  As noted above, the law also prohibited a brand company from using any ETASU to block or delay approval of an ANDA.  (*See id.*).

In September 2008, Celgene filed with the FDA its proposed REMS for Thalomid® and Revlimid®.  (*See* D.E. Nos. 228-4, Ex. 9; 228-8, Ex. 79).  In August 2010, the FDA found that REMS were necessary for Thalomid® and Revlimid ® to ensure that the benefits of the drugs outweigh their risks of side effects, and the FDA approved Celgene's REMS for each drug.  (*See* D.E. Nos. 228-4, Ex. 9; 228-8, Ex. 79).

### V.     Mylan's Causes of Action against Celgene

On April 3, 2014, Mylan brought this action against Celgene, alleging in part that Celgene "has used REMS as a pretext to prevent Mylan from acquiring the necessary samples to conduct bioequivalence studies, even after the FDA determined that Mylan's safety protocols were acceptable to conduct those studies."  (D.E. No. 1 ¶ 7).  It alleges that, "[i]n flagrant violation of federal and state antitrust laws, Celgene has unlawfully maintained monopolies over its two 'lead' products—Thalomid and Revlimid—by preventing lower-priced generic competition from entering the market."  (*Id.* ¶ 2).

Mylan asserts the following counts—some of which the Court has already dismissed and declines to further discuss here:

1.  Violation of Sherman Act Section 2 – Thalomid® – Monopolization, Attempted Monopolization and Conspiracy to Monopolize

2. Violation of Sherman Act Section 2 – Revlimid® – Monopolization, Attempted Monopolization and Conspiracy to Monopolize

3. Violation of Sherman Act Section 2 – Thalomid® – Denial of an Essential Facility or Resource Necessary to Compete

4. Violation of Sherman Act Section 2 – Revlimid® – Denial of an Essential Facility or Resource Necessary to Compete

5. [*Dismissed*]

6. [*Dismissed*]

7. [*Dismissed*]

8. Violation of the New Jersey Antitrust Act, Section ~~56:9-3 and~~ 56:9-4 – Thalomid® [*Partially Dismissed*]

9. Violation of the New Jersey Antitrust Act, Section ~~56:9-3 and~~ 56:9-4 – Revlimid® [*Partially Dismissed*]

10. Violation of the New Jersey Antitrust Act, Section ~~56:9-3 and~~ 56:9-4 – Thalomid® and Revlimid® [*Partially Dismissed*]

11. Violation of New Jersey Common Law – Thalomid® – Unfair Competition

12. Violation of New Jersey Common Law – Revlimid® – Unfair Competition

13. Violation of New Jersey Common Law – Thalomid® and Revlimid® – Unfair Competition

14. Violation of New Jersey Common Law – Thalomid® – Tortious Interference with an Economic Advantage

15. Violation of New Jersey Common Law – Revlimid® – Tortious Interference with an Economic Advantage

16. Violation of New Jersey Common Law – Thalomid® and Revlimid® – Tortious Interference with an Economic Advantage

17. Declaratory Judgment Pursuant to 28 U.S.C. §§ 2201-2202

(*See id.* ¶¶ 187-380; D.E. No. 54).

## VI.     The Summary Judgment Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A "genuine" issue of material fact exists for trial "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*

The movant bears the initial burden of establishing that no genuine issue of material fact exists.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Where the non-moving party bears the burden of proof at trial, the moving party may discharge its burden by showing "that there is an absence of evidence to support the nonmoving party's case."  *Id.* at 325.  If the movant meets this burden, the non-movant must then set forth specific facts that demonstrate the existence of a genuine issue for trial.  *Id.* at 324; *Azur v. Chase Bank, USA, Nat'l Ass'n*, 601 F.3d 212, 216 (3d Cir. 2010).

Notably, the "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Anderson*, 477 U.S. at 255.  But the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *see also Swain v. City of Vineland*, 457 F. App'x 107, 109 (3d Cir. 2012) (stating that the non-moving party must support its claim "by more than a mere scintilla of evidence").

## VII.    Does the rule-of-reason burden-shifting framework apply?

Under the "rule of reason" burden-shifting framework, the party seeking to impose liability must initially provide evidence of the anticompetitive nature of a defendant's conduct.

*Warner Chilcott*, 838 F.3d at 438.   Once established, the defendant then has the burden of proffering nonpretextual procompetitive justifications that its conduct is indeed a form of competition on the merits because it involves, for example, greater efficiency or enhanced consumer appeal.   *See id.*; *In re Suboxone (Buprenorphine Hydrochloride and Naloxone) Antitrust Litig.*, No. 16-5073, 2017 WL 4642285, at *8 (E.D. Pa. Oct. 17, 2017).   And "the plaintiff may then either rebut those justifications or demonstrate that the anticompetitive harm outweighs the procompetitive benefit."   *Mylan Pharm.*, 838 F.3d at 438.

### A.  The parties' contentions

Celgene argues that Mylan's claims under Section 2 of the Sherman Act—the only remaining Sherman-Act claims in this case—require Mylan to prove that Celgene engaged in the following anticompetitive conduct: "an improper unilateral refusal to deal that had an anticompetitive effect in the alleged relevant markets for Thalomid and Revlimid."   (D.E. No. 270 at 1).   Celgene contends that Mylan fails to show that Celgene improperly refused to deal and, even if Mylan meets this burden, Celgene "had valid business justifications for declining to sell samples on the terms demanded by Mylan."   (*Id.* at 2).   Said differently, Celgene argues that there was no improper refusal to deal and therefore no anticompetitive conduct that harmed Mylan—and thus no burden-shifting from Mylan to Celgene occurs for the first step of the analysis.   (*Id.*).   And even assuming that Mylan could show a harmful refusal to deal, "Celgene nonetheless has shown indisputably valid business justifications for insisting upon certain terms before dealing with Mylan."   (*Id.*).

At oral argument, Celgene contended that "it's assumed that you could have an anticompetitive effect" because this is a unilateral refusal-to-deal case.   (D.E. No. 277 at 6:22-7:7).   But it states that an anticompetitive effect by itself is not enough for the first prong of the

burden-shifting framework.  (*Id.* at 7:7-10).  As such, Celgene asserts that "if our justifications, if the conditions we place on the dealing here are valid business justifications, we win" and "[y]ou don't get into this sort of back-and-forth balancing."  (*Id.* at 9:3-6).  It argues that, if the Court finds that Celgene had a valid business justification, then Mylan does not get an opportunity to rebut that.  (*See id.* at 9:8-18).

Mylan contends that its obligation is to "present sufficient evidence to create a jury issue of anticompetitive effect," which "has been easily satisfied here by . . . abundant evidence." (D.E. No. 271 at 1).  And so Mylan argues that the "prima facie case shifts to Celgene" to "com[e] forward with evidence of procompetitive justification"—but Celgene's justifications fail.  (*Id.*).  Mylan lastly asserts that—although Celgene's justifications "are entirely pretextual" and therefore a balancing is unnecessary—any "balancing outcome is clear: the net effect of Celgene's conduct is anticompetitive, with higher prices and fewer choices for consumers."  (*Id.* at 2).

And at oral argument, Mylan asserted that: "Celgene cites no case from this circuit that you do not apply the standard rule of reason context in a unilateral refusal to deal case. There's no Third Circuit case that says you win if you have a valid business justification."  (D.E. No. 277 at 13:21-24).

### B.  A burden-shifting framework applies

Both parties agree that a burden-shifting framework applies here.  (*See* D.E. No. 270 at 1; D.E. No. 271 at 1).  And at oral argument, both parties summarized and confirmed their respective positions regarding each of the three steps.  *First*, Mylan says that Celgene refused to provide samples, allowing Celgene to retain monopolies over Thalomid® and Revlimid®—which "shifts the burden of going forward to Celgene to come up with a justification that is both

13

legitimate in principle and in fact was the reason for the refusal to deal." (D.E. No. 277 at 15:20-16:24. *But see* D.E. No. 270 at 2 ("Celgene did not refuse to deal with Mylan . . . . Mylan has produced no evidence that [Celgene's] demands were unreasonable or that Mylan could not comply with them . . . .")). *Second*, Celgene provides some "primary" procompetitive, non-pretextual justifications, including: "[a]ssuring that the product was going to be used safely, that patients' health was going to be maintained, and safe conditions not only for the people involved in the test but the personnel who were administering the test" and "wanting to insure itself from the liability standpoint, from indemnification, be sure that Celgene protected itself." (D.E. No. 277 at 17:2-17:25; *see also* D.E. No. 270 at 2 ("[E]ven assuming *arguendo* that Mylan could establish a refusal to deal that harmed competition, Celgene nonetheless has shown indisputably valid business justifications for insisting upon certain terms before dealing with Mylan.")). *Third*, Mylan rebuts each of the justifications. (*See, e.g.*, D.E. No. 277 at 25:17-26:2).

It appears that the parties cannot proffer (nor can the Court find) clear binding Third Circuit precedent about how the rule-of-reason burden-shifting framework specifically and neatly applies in a refusal-to-deal case such as this one. (*See also* D.E. No. 277 at 8:16-18 ("[Celgene's Counsel:] I will confess, the cases are not all the model of clarity because this area of the law is really difficult, and courts struggle with it.")). What is clear, however, is no Third Circuit precedent says that any other framework applies. *See also ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 281 (3d Cir. 2012) ("The rule of reason governs Plaintiffs' claims under Section 1 and Section 2 of the Sherman Act . . . .").

Moreover, the crux of the parties' dispute is whether Celgene had valid business justifications for its refusals that are non-rebuttable as a matter of law. As evident from the

discussion below, this is what the parties have litigated—and this is what the Court endeavors to resolve while being mindful of the applicable burden-shifting framework.

## VIII.   Section 2 of the Sherman Act

### A.  Section 2 generally

Under § 2 of the Sherman Act, a firm cannot "monopolize" or "attempt to monopolize." 15 U.S.C. § 2; *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko LLP*, 540 U.S. 398, 407 (2004).  A monopolization claim under § 2 requires (1) "the possession of monopoly power in the relevant market" and (2) "the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Trinko*, 540 U.S. at 407 (quotation marks and citation omitted).[10]

*First*, "[m]onopoly power is the ability to control prices and exclude competition in a given market." *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 307 (3d Cir. 2007).  But just possessing monopoly power—and the concomitant charging of monopoly prices—"is not only not unlawful; it is an important element of the free-market system." *Trinko*, 540 U.S. at 407. Thus, "the possession of monopoly power will not be found unlawful unless it is accompanied by an element of anticompetitive *conduct*." *Id.* (emphasis in original).  "Firms may acquire monopoly power by establishing an infrastructure that renders them uniquely suited to serve their customers." *Id.*

"The *second* element of a monopolization claim under § 2 requires the willful acquisition or maintenance of monopoly power." *Broadcom*, 501 F.3d at 308 (emphasis added).  This acquisition or maintenance of monopoly power "must be accompanied by some anticompetitive

---

[10]      "By contrast, to succeed on a claim of attempted monopolization under § 2, a plaintiff must prove (1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Warner Chilcott*, 838 F.3d at 433 (internal quotation marks, citation, and footnote omitted).

conduct on the part of the possessor." *Id.* (citation omitted). "Anticompetitive conduct may take a variety of forms, but it is generally defined as conduct to obtain or maintain monopoly power as a result of competition on some basis other than the merits." *Id.* (citation omitted). "Conduct that impairs the opportunities of rivals and either does not further competition on the merits or does so in an unnecessarily restrictive way may be deemed anticompetitive." *Id.* (citation omitted). Indeed, "the Sherman Act directs itself not against conduct which is competitive, even severely so, but against conduct which unfairly tends to destroy competition itself." *Warner Chilcott*, 838 F.3d at 438 (quotation marks and citation omitted). In short, "a monopolist will be found to violate § 2 of the Sherman Act if it engages in exclusionary or predatory conduct without a valid business justification." *Broadcom*, 501 F.3d at 318 (quoting *LePage's Inc. v. 3M*, 324 F.3d 141, 152 (3d Cir. 2003) (en banc)).

### B. Refusal to deal with competitors

"[A]s a general matter, the Sherman Act 'does not restrict the long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal.'" *Trinko*, 540 U.S. at 408 (quoting *United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919) (first alteration added)). Although the Supreme Court places a "high value . . . on the right to refuse to deal with other firms," this "does not mean that the right is unqualified." *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 601 (1985). Thus, "[u]nder certain circumstances, a refusal to cooperate with rivals can constitute anticompetitive conduct and violate § 2." *Trinko*, 540 U.S. at 408.

The Supreme Court's *Trinko* case provides key policy considerations and precepts for a refusal-to-deal case such as this one, including the following.

16

*First*, "[f]irms may acquire monopoly power by establishing an infrastructure that renders them uniquely suited to serve their customers," and "[c]ompelling such firms to share the source of their advantage is in some tension with the underlying purpose of antitrust law, since it may lessen the incentive for the monopolist, the rival, or both to invest in those economically beneficial facilities." *Id.* at 407-08.[11]  Further, "[e]nforced sharing also requires antitrust courts to act as central planners, identifying the proper price, quantity, and other terms of dealing-a role for which they are ill suited"—and "compelling negotiation between competitors may facilitate the supreme evil of antitrust: collusion." *Id.* at 408.[12]

*Second*, the Court stated that, "[u]nder certain circumstances, a refusal to cooperate with rivals can constitute anticompetitive conduct and violate § 2"—but that the Court has been "very cautious in recognizing such exceptions, because of the uncertain virtue of forced sharing and the difficulty of identifying and remedying anticompetitive conduct by a single firm." *Id.*

*Third*, "[a]ntitrust analysis must always be attuned to the particular structure and circumstances of the industry at issue. Part of that attention to economic context is an awareness of the significance of regulation." *Id.* at 411.  It is "of particular importance" to determine whether there is "a regulatory structure designed to deter and remedy anticompetitive harm." *Id.* at 412.  "Where such a structure exists, the additional benefit to competition provided by antitrust enforcement will tend to be small, and it will be less plausible that the antitrust laws

---

[11]     *See also Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 225 (1993) ("Even an act of pure malice by one business competitor against another does not, without more, state a claim under the federal antitrust laws . . . ."); *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1078 (10th Cir. 2013) ("Were intent to harm a competitor alone the marker of antitrust liability, the law would risk retarding consumer welfare by deterring vigorous competition . . . ."); *Olympia Equip. Leasing Co. v. W. Union Tel. Co.*, 797 F.2d 370, 379 (7th Cir. 1986) ("[I]f conduct is not objectively anticompetitive the fact that it was motivated by hostility to competitors . . . is irrelevant.").

[12]     *See also Trinko*, 540 U.S. at 415 ("No court should impose a duty to deal that it cannot explain or adequately and reasonably supervise. The problem should be deemed irremediable by antitrust law when compulsory access requires the court to assume the day-to-day controls characteristic of a regulatory agency.") (internal quotation marks and citation omitted).

contemplate such additional scrutiny." *Id.* "Where, by contrast, there is nothing built into the regulatory scheme which performs the antitrust function, the benefits of antitrust are worth its sometimes considerable disadvantages." *Id.*

## IX.   Celgene <u>cannot</u> be held liable under § 2 of the Sherman Act for conduct <u>before</u> FDA "approval" of Mylan's protocols

### A.  Relevant factual background

*Thalomid® Samples.*

- **9/2/2005**:  Mylan wrote to Celgene requesting 3,360 capsules of Thalomid® for bioequivalency testing.  (D.E. No. 228-4, Ex. 16);

- **12/19/2005**: Celgene responds to Mylan's 9/2/05 letter stating that Celgene "consider[s] our S.T.E.P.S. program to represent a binding commitment to the FDA that we will ensure, to the maximum extent possible, that the drug is used appropriately so as to avoid fetal exposure;" Mylan should contact the FDA to discuss S.T.E.P.S.; and, if the FDA says "in writing" to Celgene that Celgene can "violate" S.T.E.P.S., then Celgene will "further evaluate [Mylan's] request at that time."  (D.E. No. 228-5, Ex. 18);

- **1/11/2006**: Mylan writes to the FDA, attaching Celgene's 12/19/2005 letter and requesting the FDA to provide Celgene with written authorization to supply Mylan with Thalomid® capsules; Mylan also provides the FDA with proposed protocols for the bioequivalence studies it intends to conduct.  (*Id.* at Ex. 20);

- **2/8/2007**: The FDA writes Celgene, stating that the "FDA intends to exercise its enforcement discretion to permit Celgene to provide to another drug manufacturer (or its agent) 500 units of Thalomid for the purpose of conducting bioequivalence testing, when Celgene has received confirmation in writing from the sponsor, its agent, or FDA that the sponsor of the study either has an IND in effect for the study or has otherwise provided the agency with sufficient assurance that the bioequivalence study will be conducted in such a manner as to ensure the safety of the subjects."  (D.E. No. 228-6, Ex. 26);

- **2/12/2007**: The FDA wrote to Mylan, referencing Mylan's 1/11/2006 letter and stating that the FDA "intend[ed] to exercise its enforcement discretion" to permit Celgene to provide 500 units of Thalomid® to another drug manufacturer "when Celgene has received confirmation in writing from the sponsor, its agent, or FDA that the sponsor of the study either has an IND in effect for the study or has otherwise provided the agency with sufficient assurance that the bioequivalence study will be conducted in such a manner as to ensure the safety of the subjects"; and "[t]hese safeguards would represent a substitute for the controls present in the S.T.E.P.S. program."  (*Id.* at Ex. 28);

- **5/1/2007**: Mylan writes to the FDA stating that "[o]nce the Agency has reviewed the enclosed study protocols and has determined that Mylan has provided sufficient safeguards to assure that the bioequivalence studies will be conducted in such a manner as to ensure the safety of the subjects, we would appreciate receiving your written confirmation," which "will then be forwarded to Celgene." (*Id.* at Ex. 29);

- **9/11/2007**: The FDA writes to Mylan, stating that "[t]he proposed bioequivalence study protocol comparing Thalidomide Capsules . . . to . . . Thalomid® (Thalidomide) Capsules . . . are acceptable, provided that" Mylan includes 14 "recommendations." (*Id.* at Ex. 30);

- **11/16/2007**: Mylan writes to Celgene stating that "it is Mylan's understanding that" the FDA "informed Celgene that FDA intends to exercise enforcement discretion to permit Celgene to provide another drug manufacturer with Thalomid® for the purpose of conducting bioequivalence . . . testing"—and that "this letter confirms that Mylan has received affirmation from the Agency indicating that Mylan's proposed bioequivalence study protocols regarding Thalidomide Capsules provide adequate safety measures to ensure the safety of subjects" and Mylan "is prepared to pay full value for the shipment . . . of Thalomid® capsules." (*Id.* at Ex. 32).

### *Revlimid® Samples.*

- **8/24/2012**: Mylan submits lenalidomide bioequivalence safety protocols to the FDA for review and requested "written confirmation" when the FDA determined that the protocols had "the appropriate safeguards"—and Mylan represented to the FDA that this written confirmation would then be provided to Celgene with a request for Revlimid®. (*See* D.E. No. 228-9, Ex. 84);

- **10/1/2012**: The FDA writes to Mylan stating that the FDA reviewed Mylan's protocols (as referenced in Mylan's 8/24/2012 letter to the FDA) and, "[b]ased upon the comparison of the safety measures in the latest approved Revlimid® labeling and the Risk Evaluation and Mitigation Strategy (REMS) RevAssist® program to the safety measures in the submitted protocols, the protocols are not safe to proceed and [certain] additions to the protocols are recommended. . . ." (*Id.* at Ex. 85);

- **11/19/2012**: Mylan writes to the FDA providing additional information and stating that "Mylan does still desire [the FDA's] assistance in obtaining . . . Revlimid®, so that we can conduct the necessary chemistry and bioequivalence testing to support the future filing of an Abbreviated New Drug Application (ANDA)." (*Id.* at Ex. 86);

- **2/28/2013**: The FDA writes Mylan stating that "[b]ased upon the comparison of the safety measures in the latest approved Revlimid® labeling and the Risk Evaluation and Mitigation Strategy (REMS) RevAssist® program to the safety measures in the submitted protocols, the three protocols are not safe to proceed." (*Id.* at Ex. 87);

- **5/1/2013**: Mylan writes to Celgene requesting Revlimid® samples, stating that "Mylan's safety protocols for its proposed bioequivalence testing have been submitted to the Office

of Generic Drugs" and Mylan's "bioequivalence studies will be conducted in a manner to ensure the safety of the subjects." (*Id.* at Ex. 88);

- **5/7/2013**: Mylan writes to the FDA in response to the FDA's 2/28/2013 letter, submitting additional information and certain revisions. (*Id.* at Ex. 89);

- **5/14/2013**: Celgene writes to Mylan in response to Mylan's 5/1/2013 letter, stating that "Celgene will sell Revlimid to Mylan for the sole purpose of *in vitro* and *in vivo* bioequivalence testing necessary to support an ANDA upon (i) our satisfactory review of the documents requested [in the letter] and (ii) the execution of a Supply Agreement which will include the terms and conditions for sale, including indemnification provisions." Celgene also requested (among other things in nine categories of information) "written confirmation that Mylan's bioequivalence protocols have been approved by the [FDA]" and "written confirmation the FDA will allow Celgene to sell the requested amount of Revlimid . . . to Mylan." (*Id.* at Ex. 90);

- **7/29/2013**: The FDA writes Mylan in response to Mylan's 5/7/2013 letter, stating that the "three submitted protocols are safe to proceed." (*Id.* at Ex. 91);

- **3/11/2014**: Mylan writes Celgene, stating that the "letter serves to notify Celgene that Mylan has received all necessary approvals from the FDA to conduct the requested bioequivalence testing," citing the 7/29/2013 letter from the FDA to Mylan and attaching a copy of that letter to its correspondence." (*Id.* at Ex. 92).

### B. The parties' contentions

Celgene argues that "there is no dispute that *until* at least November 2007, the FDA's February 2007 condition for permitting Celgene to sell Thalomid samples to Mylan was not satisfied." (D.E. No. 228 at 30 (emphasis in original)). And, for Revlimid®, Celgene contends that "[i]n August 2012, Mylan submitted to the FDA protocols for a lenalidomide study. The FDA rejected them, as well as Mylan's second submission, as 'not safe to proceed.' The FDA approved Mylan's protocols on its third attempt, in July 2013, and Mylan so informed Celgene in March 2014." (*Id.* (internal citations omitted)).

Celgene asserts that "[u]ntil the FDA informed Celgene that it would permit a sale for generic bioequivalence testing, and until Mylan communicated to Celgene that the FDA had approved its testing protocols, Celgene indisputably had at least a reasonable basis to fear that an

extra-REMS sale of Thalomid or Revlimid would run afoul of the law—and potentially subject Celgene to FDA enforcement or a misbranding prosecution." (*Id.* at 31). Celgene argues that "in the absence of FDA approval, the antitrust laws do not compel a manufacturer to sell samples of a REMS product to a generic manufacturer for purposes of bioequivalence testing." (*Id.* at 32 (citations omitted)). And Celgene contends that, "[i]n addition to the law, the undisputed evidence in discovery refutes Mylan's argument that Celgene should have sold it samples before receiving the FDA's permission." (*Id.* at 33). Celgene maintains that "it was reasonable for Celgene to condition selling Thalomid and Revlimid samples on FDA authorization" and that "summary judgment should be granted on Mylan's claims that Celgene should have sold samples before Mylan informed Celgene of FDA's alleged approval." (*Id.* at 34).

In opposition, Mylan asserts that "Celgene never questioned the legality of providing samples to third parties outside of the REMs programs," and only for generic companies, "Celgene claimed that it needed approval from FDA. . . ." (D.E. No. 237 at 25). Mylan claims that, "at least after receiving FDA approval, Celgene had no reason (other than its anticompetitive desire to foreclose competition) to refuse to sell samples to Mylan." (*Id.* at 37). It asserts "the evidence makes clear that FDA review and approval of bioequivalence protocols is not required by law"—and the "FDA introduced the procedure in this case because there had been complaints about Celgene's refusal to provide samples." (*Id.*). Mylan maintains that generic companies were "permitted (but not required) to submit protocols for FDA review and the agency would then permit its approval to be communicated to Celgene in order to satisfy safety-related concerns." (*Id.* at 37-38). Mylan argues that "FDA review and approval of their bioequivalence protocols was unnecessary and Celgene's insistence on that review was part of its anticompetitive scheme." (*Id.* at 39-40).

### C.  Analysis

As noted, "a monopolist will be found to violate § 2 of the Sherman Act if it engages in exclusionary or predatory conduct without a valid business justification."  *LePage's Inc*, 324 F.3d at 152; *see also Retractable Techs., Inc. v. Becton Dickinson & Co.*, 842 F.3d 883, 892 (5th Cir. 2016) ("To determine whether conduct is exclusionary, the court looks to the proffered business justification for the act. If the conduct has no rational business purpose other than its adverse effects on competitors, an inference that it is exclusionary is supported.") (internal quotation marks and citations omitted).

As an initial matter, both parties—seemingly for the sake of convenience and for summary-judgment purposes—refer to the following as FDA "approvals" of Mylan's proposed bioequivalence study protocols that were conveyed to Celgene: (1) the November 16, 2007 letter relating to Thalomid® from Mylan to Celgene that confirmed Mylan "received affirmation from the [FDA] indicating that Mylan's proposed bioequivalence study protocols regarding Thalidomide Capsules provide adequate safety measures to ensure the safety of subjects"[13]; and (2) the March 11, 2014 letter relating to Revlimid® from Mylan to Celgene that served "to notify Celgene that Mylan has received all necessary approvals from the FDA to conduct the requested bioequivalence testing."[14]  (*See, e.g.*, D.E. No. 228 at 9-10, 11-12, 30, 34; D.E. No. 237 at 10, 13, 37-38; D.E. No. 277 at 19:8-20:5, 35:2-6, 54:12-22).

The Court finds there is no genuine dispute of material fact that Celgene acted reasonably by requiring FDA approval before selling Mylan samples of Thalomid® and Revlimid®.  In so finding, the Court assumes Mylan meets the first prong of the burden-shifting framework.  But the Court finds that Celgene has met its burden at this stage that it had a valid business

---

[13]      (D.E. No. 228-6, Ex. 32).

[14]      (D.E. No. 228-9, Ex. 92).

justification for requiring FDA approval—which Mylan has not rebutted for this issue to go to a jury. *See Morris Comm'cns Corp. v. PGA Tour, Inc.*, 364 F.3d 1288, 1295 (11th Cir. 2004) ("Unlawful monopoly power requires anticompetitive conduct, which is conduct without a legitimate business purpose . . . .").

To begin with, the FDA's July 1998 NDA-approval letter for Thalomid® provides, in relevant part, as follows:

> We have reviewed this application under the restricted distribution regulations contained in 21 CFR 314 (Subpart H) and have concluded that restrictions on distribution and use of thalidomide are needed to assure safe use of the product. Please see 21. CFR 314.520.

> We have completed our review of this application, including the restrictions on the distribution and use of this product you suggested in your June 8, 1998 submission to the NDA entitled "System for Thalidomide Education and Prescribing Safety (S.T.E.P.S.)." We have concluded that adequate information has now been presented to demonstrated [sic] that the drug, when marketed in accordance with the terms of restricted distribution and use outlined in the June 8, 1998 S.T.E.P.S. document, is safe and effective for use . . . .

> Please note that the June 8, 1998 S.T.E.P.S. restricted distribution program is an integral part of the approved NDA for this product and is an essential component of the terms of this NDA's approval by FDA for marketing this product in the United States. As such, any proposed change(s) in the S.T.E.P.S. program must be submitted to the FDA as a supplement to this NDA and any proposed change(s) must have FDA prior approval before implementation. Changing the S.T.E.P.S. program without prior FDA approval may render the product misbranded and an unapproved new drug.

> . . . .

> In order to monitor the success of compliance with the restricted distribution provisions of this approval action, we intend to conduct inspections of the monitoring sites, . . . as well as Celgene's records during the first quarter after product launch. We will meet with you to discuss the inspections within one month

> after completions of the inspections. Inspections and meetings with
> you will continue periodically thereafter as appropriate.

(D.E. No. 228-3, Ex. 1).

In its February 8, 2007 correspondence to Celgene, the FDA stated, in relevant part, that

the agency

> intends to exercise its enforcement discretion to permit Celgene to
> provide to another drug manufacturer (or its agent) 500 units of
> Thalomid for the purpose of conducting bioequivalence testing,
> *when Celgene has received confirmation in writing from the*
> *sponsor, its agent, or FDA that the sponsor of the study either has*
> *an IND in effect for the study or has otherwise provided the agency*
> *with sufficient assurance that the bioequivalence study will be*
> *conducted in such a manner as to ensure the safety of the subjects.*

 (D.E. No. 228-6, Ex. 26 (emphasis added)).

As for Revlimid®, the FDA's December 2005 NDA-approval letter states, in relevant

part, as follows:

> It is approved under the provisions of 21 CFR 314.520 (Subpart H)
> . . . for use as recommended in the agreed upon labeling text,
> required patient labeling, and the components of the RevAssist$^{SM}$
> Risk Minimization Action Plan (RiskMAP).
>
> Under 21 CFR 314.520 (Subpart H), distribution of the drug is
> limited as described below and in the attached detailed
> RevAssist$^{SM}$ program. The primary goal of the RevAssist$^{SM}$
> program is to prevent fetal exposures, pending complete and
> adequate characterization of the teratogenic potential of
> lenalidomide.
>
> . . . .
>
> We remind you that your Revlimid® RiskMAP (called
> RevAssist$^{SM}$) is an important part of the postmarketing risk
> management for Revlimid® . . . .
>
> . . . .
>
> Any change to the [Revlimid® Risk Minimization Action Plan]
> must be discussed with FDA prior to its institution and is subject to

> FDA's determination that the required components continue to be met. We expect your continued cooperation to resolve any problems regarding the RevAssist$^{SM}$ program that may be identified following approval of this application.

(D.E. No. 228-8, Ex. 77).

> In its May 14, 2013 correspondence to Mylan, Celgene stated, in relevant part, that

> Please provide written confirmation that Mylan's bioequivalence protocols have been approved by the Food and Drug Administration ("FDA"), a copy of such FDA approved protocols, and written confirmation that the FDA will allow Celgene to sell the requested amount of Revlimid (2800 capsules) to Mylan (we note in your letter that Mylan has submitted its protocols to the Office of Generic drugs) . . . .

 (D.E. No. 228-9, Ex. 90).

Mylan's own expert testified at deposition that it was not unreasonable to get assurances from the FDA—a point Mylan conceded at oral argument.  (*See* D.E. No. 228-6, Ex. 31 at 59:12-60:12, 67:13-17; *see also* D.E. No. 277 at 41:10-21 ("[Court:] Doesn't your own expert – I pulled that transcript, I have it – doesn't your own expert say it was not unreasonable to get assurances from the FDA? [Mylan's Counsel]: He does, your Honor, and that testimony is there, and I would expect Celgene to argue it vociferously to the jury. But it does not eliminate a question of fact on that issue, your Honor. But, absolutely, he said that. We don't believe it was correct, but he said it. He's our expert. We're held to it . . . . It is something that the jury will have to weigh when the jury hears it.")).

And Mylan also conceded at oral argument that it asked for FDA approval of other companies' study protocols when such companies made sample requests to Mylan for clinical testing.  (*See* D.E. No. 277 at 50:17-51:13; *see also* D.E. No. 228-10, Ex. 107 (discussing "a request from Amneal to purchase a quantity of Amnesteem (isotretinoin) from Mylan for purposes of completing its product development program" and stating that "Mylan is happy to

cooperate with Amneal and make the product available," but "Mylan will just need a letter from the FDA confirming that Amneal has submitted bioequivalence study protocols that provide for the necessary safety precautions for prevention of fetal exposure to isotretinoin and that the FDA has reviewed those protocols and found them acceptable")).

To be sure, Mylan implies that Celgene has provided Thalomid® and Revlimid® to thousands of investigator-initiated trials ("IITs"), as well as other pharmaceutical companies, that would not result in a competitive threat—*without* requiring FDA review and approval of protocols. (*See* D.E. No. 237 at 16-17, 24-26).

But the record does not support Mylan's contention. Rather, Celgene has come forward with record evidence showing the opposite. (*See* D.E. No. 240-1, Celgene's Reply Statement of Material Facts ("Celg. Reply SMF") ¶ 317)). In particular, Celgene cites the following deposition testimony: "Every single patient that is enrolled in an investigator-initiated trial is enrolled in either STEPS or RevAssist or the lenalidomide counseling program." (D.E. No. 240 at 6 n.5; D.E. No. 240-4, Ex. 130 at 90:9-15;[15] *see also* D.E. No. 238-29, Ex. P307 at 4 (agreement between Celgene and Merck & Co., Inc. in which Merck & Co. must "ensure that the Investigators will prescribe . . . Revlimid® and will: a) register with Celgene's RevAssist® Program prior to prescribing . . . b) require that all Clinical Trial subjects register with Celgene's RevAssist® Program . . . and c) require that all Clinical Trial subjects return all unused" Revlimid® "in accordance with the RevAssist® Program")).

Mylan cites a portion of deposition testimony and argues that Celgene conceded "that it knew that it is possible for a company to conduct human trials using Thalidomide without necessarily using the precise STEPS method." (*See* D.E. No. 237 at 40 (internal quotation marks

---

[15]     The deponent previously "managed the implementation and execution of all investigator-initiated trials that involved Thalomid and Revlimid." (D.E. No. 238-27, Ex. P299 at 21:16-19; *see also id.* at 25:3-9).

omitted) (citing Celg. Reply SMF ¶ 333)).  But Mylan leaves out a portion reproduced in its own statement of material facts: "STEPS was designed and RevAssist was designed to mimic the types of controls we have in an IRB approved clinical trial in a commercial setting . . . [Y]es, it is possible to conduct a trial without using our STEPS or Lenalidomide REMS, *but we have to be assured that it meets a [sic] minimum standards of what is established in the way we commercially distribute our drug*."  (Celg. Reply SMF ¶ 333 (alterations in original) (emphasis added)).  After all, the issue is whether there was an objectively legitimate business justification in requiring FDA approval of study protocols before turning over samples, not the precise use of Celgene's REMS programs.  *See LePage's Inc.*, 324 F.3d at 152 ("[A] monopolist will be found to violate § 2 of the Sherman Act if it engages in exclusionary or predatory conduct without a valid business justification.").[16]

Further, persuasive authority supports that—until Celgene was informed about the FDA's approval of Mylan's testing protocols for either drug—no reasonable jury can infer that Celgene had no objectively legitimate business justification for not selling Mylan samples of Thalomid® or Revlimid®.  *See Natco Pharma*, 2015 WL 5718398, at *4-6 (granting brand company's motion to dismiss generic company's Section 2 refusal-to-deal claims, in part, because "complying with FDA requirements requiring a valid prescription before dispensing [the brand product] constitutes a valid business reason to refuse to dispense [the brand product] outside of the REMS requirements"); *cf. In re Thalomid and Revlimid Antitrust Litig.*, No. 14-6997, 2015 WL 9589217, at *15 (D.N.J. Oct. 29, 2015) (denying Celgene's motion to dismiss plaintiffs' complaint because they "specify that Mylan and [another generic company named Lannett

---

[16]     *See also Morris Comm'cns Corp.*, 364 F.3d at 1295 ("Even a company with monopoly power has no general duty to cooperate with its business rivals and may refuse to deal with them if valid business reasons exist for such refusal. . . . Unlawful monopoly power requires anticompetitive conduct, which is conduct without a legitimate business purpose that makes sense only because it eliminates competition.") (internal quotation marks and citations omitted).

Company, Inc. ("Lannett")] gave Celgene letters from the FDA that stated that the agency would

not take action should Celgene provide samples to them" and "Celgene continued to refuse to

deal," which "raises a plausible inference that Celgene's reliance on its distribution programs is

pretextual").

The overarching flaw with Mylan's position—regarding alleged liability for Celgene's

conduct before FDA "approval" of Mylan's protocols—seems to be that a jury could find

liability based apparently only on intent.  For example, Mylan states that:

> at least after receiving FDA approval, Celgene had no reason
> (other than its anticompetitive desire to foreclose competition) to
> refuse to sell samples to Mylan. . . .  The FDA introduced the
> procedure in this case because there had been complaints about
> Celgene's refusal to provide samples. Generics were therefore
> permitted (but not required) to submit protocols for FDA review
> and the agency would then permit its approval to be communicated
> to Celgene in order to satisfy safety-related concerns. . . . *Although
> Mylan did not protest contemporaneously to Celgene that FDA
> approval was unnecessary, Mylan did not have access to all of the
> evidence it now has demonstrating that Celgene's modus operandi
> was to delay and foreclose generic entry to protect its monopoly
> over the thalidomide and lenalidomide markets. Now, after
> discovery, it is clear that Celgene's intent was to restrict
> competition.*

(D.E. No. 237 at 37-38 (emphasis added) (internal citations omitted)).

As stated by the Court of Appeals for the Ninth Circuit, however, intent "is not sufficient

alone to establish liability."  *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1184 (9th

Cir. 2016) ("Competitors are not required to engage in a lovefest; indeed, '[e]ven an act of pure

malice by one business competitor against another does not, without more, state a claim under

the federal antitrust laws.'") (quoting *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,

509 U.S. 209, 225 (1993)); *see also Olympia Equip. Leasing Co. v. W. Union Telegraph Co.*, 797

F.2d 370, 379 (7th Cir. 1986) ("[I]f conduct is not objectively anticompetitive the fact that it was motivated by hostility to competitors . . . is irrelevant.").

In sum, the record in this case, as well as persuasive authority, compels this Court to find that there is no genuine issue of material fact that it was objectively reasonable for Celgene to require FDA approval of Mylan's protocols before selling Mylan samples of either Thalomid® or Revlimid®. Celgene is therefore granted summary judgment on Mylan's claims that Celgene improperly withheld samples of either of these drugs before receiving assurance that the FDA had approved Mylan's protocols.

**X.   Issues of material fact <u>exist</u> about whether Celgene can be held liable under § 2 of the Sherman Act for conduct <u>after</u> FDA "approval" of Mylan's protocols**

### A.  Relevant factual background

*Thalomid® Samples.*

- **9/11/2007**: The FDA writes to Mylan, stating: "The proposed bioequivalence study protocol comparing Thalidomide Capsules . . . to . . . Thalomid® (Thalidomide) Capsules . . . are acceptable, provided that" Mylan includes 14 "recommendations." (D.E. No. 228-6, Ex. 30);

- **11/16/2007**: Mylan writes to Celgene stating that "it is Mylan's understanding that" the FDA "informed Celgene that FDA intends to exercise enforcement discretion to permit Celgene to provide another drug manufacturer with Thalomid® for the purpose of conducting bioequivalence . . . testing" and that "this letter confirms that Mylan has received affirmation from the Agency indicating that Mylan's proposed bioequivalence study protocols regarding Thalidomide Capsules provide adequate safety measures to ensure the safety of subjects." (*Id.* at Ex. 32);

- **11/21/2007**: Celgene's then-Regulatory and Compliance Counsel sends a calendar-invite email to several Celgene executives with the subject line "Exclusivity Strategy Special meeting," stating that another generic company's request "is deficient in a way that the Mylan request is not, and the Mylan request is what we should anticipate future requests looking like." (*See* D.E. No. 237-16, Ex. P26);

- **1/8/2008**: Celgene writes to Mylan in response to Mylan's 11/16/2007 letter, stating that "Mylan seeks to purchase 2,500 capsules of Thalomid®" which is "contrary to FDA's stated enforcement discretion policy" that "established a 500-unit limit" such that "Celgene is prohibited from provided the requested Thalomid®." Celgene also requests

that Mylan provide additional information such as "intended risk management measures," stating that "Celgene's concerns about distributing Thalomid® outside of the S.T.E.P.S.® program are independent of FDA's regulatory oversight" and "there are significant business and liability concerns associated with Celgene's distribution of Thalomid®." Further, Celgene inquires about indemnification relating to Mylan's proposed studies. (D.E. No. 228-6, Ex. 34);

- **2/25/2008**: Mylan responds to Celgene's 1/8/2008 letter, stating that it is "curious that [Celgene] is asking for these voluminous and proprietary materials only now, many months after our initial exchange" where no mention of wanting such items was made and that "Celgene is using these information requests as pretext to continue to delay generic competition to Thalomid®." Further, Mylan provides a draft confidentiality agreement and states that "in hopes of avoiding further delay," Mylan is prepared to provide Celgene immediately with all the requested information on a confidential basis. (D.E. No. 238-13, Ex. P170);

- **6/27/2008**: Mylan writes Celgene (in response to Celgene's 1/8/2008 letter), stating that it "has received affirmation from FDA indicating that Mylan's proposed study protocols for Thalidomide capsules provide adequate safety measures to ensure the safety of patients sufficient to permit the Agency to exercise its enforcement discretion in permitting the transfer of a limited amount of Thalomid® for study purposes." Mylan also raises concern that Celgene is using "information requests as a pretext to continue to delay generic competition to Thalomid®," but "in hopes of avoiding further delay, we provide you with all of the information you requested." Mylan also represents that it "is willing to enter into an appropriate indemnification arrangement to indemnify Celgene" for liability resulting from Mylan's studies. (D.E. No. 228-7, Ex. 39);

- **6/24/2009**: Celgene writes Mylan, stating that Mylan has not provided Celgene a copy of the FDA's approval letter and Mylan's proposed bioequivalence protocol—and noting certain purported omissions from Mylan's submitted information as of that day. (*Id.* at Ex. 43; Celg. SMF ¶ 52).

***Revlimid® Samples.***

- **5/14/2013**: Celgene writes to Mylan in response to a 5/1/2013 letter from Mylan, stating: "Celgene will sell Revlimid to Mylan for the sole purpose of in vitro and in vivo bioequivalence testing necessary to support an ANDA upon (i) our satisfactory review of the documents requested [in the letter] and (ii) the execution of a Supply Agreement which will include the terms and conditions for sale, including indemnification provisions." Celgene also requested (among other things in nine categories of information) "written confirmation that Mylan's bioequivalence protocols have been approved by the [FDA]." (D.E. No. 228-9, Ex. 90);

- **7/29/2013**: The FDA writes Mylan in response to a 5/7/2013 letter, stating that Mylan's "three submitted protocols are safe to proceed" and "include adequate safeguards that

serve as an appropriate substitute for the controls present in the FDA mandated Revlimid® REMS program for ensuring patient safety." (*Id.* at Ex. 91);

- **3/11/2014**: Mylan writes Celgene, stating that this "letter serves to notify Celgene that Mylan has received all necessary approvals from the FDA to conduct the requested bioequivalence testing," citing the 7/29/2013 letter from FDA to Mylan and attaching a copy of that letter to its correspondence. Mylan also states that it "will not reengage in the back-and-forth correspondence initiated by Celgene over a more than three year period when Mylan similarly sought samples of thalidomide. . . ." Mylan further provided terms regarding indemnification. (*Id.* at Ex. 92);

- **3/20/2014**: Celgene writes Mylan, reiterating its requests for the information it requested in its 5/14/2013 letter. Celgene also represents that it would sell Revlimid® samples to Mylan upon its "satisfactory review of the documents and information" it requested and the execution of a Supply Agreement, including indemnification provisions substantially similar to the indemnification provisions that Mylan had proposed. (D.E. No. 237-27, Ex. P77);

- **5/19/2014**: The FDA writes Celgene stating that it has received a request from Mylan for help in getting Revlimid® "supplies" to test "a proposed generic lenalidomide product against Revlimid" and it "will not consider it a violation of the REMS for Celgene to provide to Mylan (or its agent) a quantity of Revlimid sufficient to allow Mylan to perform the testing to support its abbreviated new drug application." Further, the FDA noted that federal law "prohibits the holder of a new drug application covered by a REMS from using [REMS' elements] to block or delay approval of" an ANDA. Finally, the FDA said it "expects Celgene to provide Mylan with a sufficient quantity of REVLIMID to conduct necessary testing, but in any event no less than 500 capsules of each strength (2.5mg, 5mg, 10mg, 15mg and 25mg)." (D.E. No. 228-9, Ex. 93).

### B. The parties' contentions

Celgene argues that "Mylan never contests that it was reasonable for Celgene to insist on information and assurances from Mylan before selling these highly dangerous medicines." (D.E. No. 240 at 4). It contends that "[t]he FDA's purported approval—which Mylan refused to disclose to Celgene until discovery in this litigation . . . —gave Celgene no assurances, for example, that Mylan had sufficient insurance or that Mylan would indemnify Celgene against losses." (*Id.* at 8 (internal citation omitted)).

In opposition, Mylan asserts that "Celgene purposefully developed iterative requests for which no reasonable end could be reached." (D.E. No. 237 at 23). Mylan argues that Celgene

put Mylan "through multiple rounds of questioning that could only have been for the purpose of delay." (*Id.*).  As an example, Mylan states that Celgene "chose to wait until serving Mylan with a second set of information demands in 2009—nearly four years after Mylan's initial request to procure product and after Mylan had already produced hundreds of pages of information that went unreviewed by anyone at Celgene."  (*Id.* (citations omitted)).  Mylan further contends that "several individuals identified by Celgene as the 'key decision-makers' regarding Mylan's request for samples never even reviewed the information sent by Mylan" and that "executives and employees who typically evaluated information from requesting parties ultimately played no role in processing generic requests."  (*Id.* at 22).

### C.  Analysis

As for Celgene's conduct after receiving notice of FDA approval of Mylan's protocols, there are genuine issues of material fact such that a reasonable jury could infer that Celgene had no objectively legitimate business justification for not selling Mylan samples of Thalomid® or Revlimid®.

Although redundant in part, it is critical to recount some key events, as well as provide additional background.  As noted regarding Thalomid®, Mylan's November 16, 2007 letter to Celgene stated that the FDA had approved Mylan's proposed protocols and that Mylan would pay the full value of shipment of Celgene's samples.  (*See* D.E. No. 277 at 66:1-7).  On January 8, 2008, Celgene wrote Mylan, questioning the amount of requested Thalomid® samples and requesting more information.  (*See id.* at 66:8-19).  On February 25, 2008, Mylan sent Celgene a letter in which Mylan represented that it was "prepared to provide" all the requested information from Celgene's January 8, 2008 letter.  (D.E. No. 238-13, Ex. P170).  Further, Mylan "enclosed

a simple confidentiality agreement which [Mylan] ask[ed] that Celgene sign and return"—and if "any changes" are desired, to immediately contact Mylan.  (*Id.*).

Celgene and Mylan negotiated over the confidentiality agreement until June 24, 2008, when Celgene sent Mylan the executed agreement.  (Celg. Reply SMF ¶ 203).  On June 27, 2008, Mylan sent Celgene a letter providing responses and supplemental information in response to Celgene's requests in its January 8, 2008 letter and also offered to enter into an appropriate indemnification agreement.  (*Id.* ¶ 204).  Celgene disputes any implication that Mylan's responses were complete and satisfactory.  (*Id.*).

On July 25, 2008, Mylan sent Celgene a follow-up letter because it had not received a response to its June 27, 2008 letter, setting an August 1, 2008 deadline for a response or else it would pursue legal action.  (*Id.* ¶ 205).  In an August 1, 2008 letter, Celgene represented to Mylan that it was "carefully reviewing the documentation" that Mylan provided with its June 27, 2008 letter and that it would send Mylan a draft indemnification agreement by August 15, 2008. (*Id.* ¶ 206).  But in his deposition, Celgene's then-Regulatory and Compliance Counsel confirmed that, as of March 4, 2011, no "business people" at Celgene had reviewed the supporting documentation sent by Mylan in response to Celgene's January 8, 2008 letter.  (*Id.* ¶¶ 181, 209).

On August 15, 2008, Celgene sent a draft indemnification agreement to Mylan and the parties exchanged negotiation-related correspondence.  (*See id.* ¶¶ 211-12).  Finally, in a June 24, 2009 letter, Celgene wrote Mylan requesting the FDA's approval letter concerning Mylan's testing protocol, a copy of the protocol, and certain evidence concerning insurance.  (D.E. No. 228-7, Ex. 43).

There are issues of fact—which may be interrelated—that are apparent from this history. First is timing.  For example, regarding Mylan's request for Thalomid® samples, why did Celgene not ask for the FDA approval letter before June 24, 2009 as opposed to sooner?  (*See, e.g.*, Celg. Reply SMF ¶ 213; *see also* D.E. No. 277 at 79:5-83:6).  To be sure, at oral argument, Celgene argued that timing issues (such as this one) are not fatal to summary judgment.  For example, it explained that these timing issues related to what it learned through its "dealings" with another generic company, Lannett Company, Inc., who also sought samples from Celgene. (*See* D.E. No. 277 at 78:16-80:21).  But as the Court indicated during the oral argument, this explanation must be presented to a jury.  (*See id.* at 80:22-24; *see also id.* at 81:20-83:6).

Moreover, no "business people" at Celgene reviewed Mylan's supporting documentation in response to Celgene's January 8, 2008 letter.  (Celg. Reply SMF ¶¶ 181, 209).  But Celgene served an interrogatory response in a Federal Trade Commission (the "FTC") investigation that the two then-CEOs "made the decisions on behalf of Celgene regarding Celgene's responses to pharmaceutical companies requesting to purchase THALOMID® or REVLIMID®" with legal advice from Celgene's Deputy General Counsel and then-Regulatory and Compliance Counsel. (Celgene Reply SMF ¶ 207).  Yet one of these two CEOs testified at deposition that "he did not have any input into Celgene's information requests on January 8, 2008, did not know for sure who had provided input, and had never seen Mylan's June 27, 2008 letter responding to the requests"—and further, "he could not recall reviewing 'a single response from a generic company' to Celgene's information requests, or sitting in any meeting with Celgene's legal, regulatory, or drug safety departments where such a response was discussed."  (*Id.*).  And the other CEO testified that "he had no 'personal knowledge of whether' anyone actually reviewed the protocols submitted by various generic companies over time."  (*Id.* ¶ 208).

In sum, the Court finds that there are genuine issues of material facts such that a reasonable jury could infer that Celgene had no objectively legitimate business justification for not selling Mylan samples of Thalomid® or Revlimid® samples after FDA approval of Mylan's study protocols.[17]  Policy considerations further bolster this finding.

"Antitrust analysis must always be attuned to the particular structure and circumstances of the industry at issue"—and "[p]art of that attention to economic context is an awareness of the significance of regulation."  *Trinko*, 540 U.S. at 411.  In fact, the Supreme Court stated in *Trinko* that "regulatory context . . . may also be a consideration in deciding whether to recognize an expansion of the contours of § 2."  *Id.* at 412.  Juxtaposing the post-FDA approval record here with the policy behind the Hatch-Waxman Act—as well as the absence of a regulatory mechanism by which an agency can compel Celgene to turn over samples to Mylan—weighs against granting Celgene summary judgment for claims involving conduct after FDA approval of Mylan's protocols.  *Cf. In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*, 64 F. Supp. 3d at 687 ("[R]egulatory structure requiring cooperation actually diminishes the need for antitrust scrutiny.").

---

[17]     Celgene's motion for summary judgment seeks dismissal of Mylan's claims for attempted monopolization and denial of an "essential facility."  (*See, e.g.*, D.E. No. 240 at 8 n.8).  But Celgene's proffered basis for dismissal of these claims assumes that—whether before or after FDA approval—there is no genuine issue of material fact that Celgene had a legitimate business justification for refusing to provide samples of Thalomid® and Revlimid®.  (*See id.*).  Because the Court cannot dismiss Mylan's claims insofar as they concern Celgene's conduct *after* FDA approval of Mylan's protocols, the Court cannot dismiss Mylan's claims for attempted monopolization and denial of an "essential facility" at this time.

     Similarly, because Mylan's state antitrust claims rise and fall with the federal antitrust claims, the Court denies Celgene's motion insofar as it seeks dismissal of those claims in their entirety.  (*See* D.E. No. 277 at 184:11-23).

**XII.    Mylan <u>cannot</u> recover monetary damages for claims concerning Revlimid®**

**A.  The parties' contentions**

Celgene argues that, although Mylan did not ask for Revlimid® samples until 2013, "its theory assumes that, in the but-for world, Mylan would have obtained samples, developed a generic product, passed bioequivalence testing, and filed an ANDA—all by January 2010." (D.E. No. 228 at 35).  "No reasonable jury could so find," says Celgene.  (*Id.*).

In particular, Celgene contends that Natco Pharma ("Natco"), another generic company, filed an ANDA seeking FDA approval to market a generic version of Revlimid® in July 2010. (*Id.* (citing Celg. SMF ¶¶ 113-15)).  It says that Celgene and Natco then engaged in patent litigation relating to Natco's ANDA filing—but settled such that Natco can market a limited amount of its generic version beginning in 2022, with full market entry in 2026.  (*Id.* at 13, 35). Notably, Celgene asserts that "Mylan's sole damages theory for Revlimid" is that, had Celgene sold Mylan Revlimid® samples, "Mylan would have been able to file an ANDA before Natco, and that Mylan, instead of Natco, would be the one to enter the market in 2022 as the exclusive ANDA seller of generic lenalidomide."  (*Id.* at 35-36 (citations omitted)).  In other words, Celgene states that "Mylan's expert's damages model assumes that Mylan would have filed its ANDA in January 2010, before Natco, and that Mylan would have negotiated the same patent litigation settlement with Celgene that Natco did"—even though "Mylan did not ask Celgene for Revlimid samples until 2013."  (*Id.* at 38 (citations omitted)).[18]  Celgene argues that there is no evidence supporting this assumption.  (*See id.*).

---

[18]     (*See also* D.E. No. 228 at 38 ("Mylan must produce evidence that, but for Celgene's allegedly unlawful conduct, Mylan would have: (i) asked Celgene for samples of Revlimid in 2008—five years before it actually did ask; (ii) developed a generic lenalidomide product in one-sixth of the time it actually took; (iii) shown that its product was bioequivalent to Revlimid by January 2010; and (iv) obtained the same patent settlement license from Celgene that Natco did after years of litigation.")).

36

Critically, Celgene argues—in supplemental briefing requested by the Court—that, if the Court finds that Celgene cannot be held liable for conduct *before* FDA approval of Mylan's protocols, the Court need not decide whether Mylan can recover damages for Revlimid®.  (*See* D.E. No. 270 at 3).  Celgene thus avers that any claim concerning Revlimid® should be limited to injunctive relief.  (D.E. No. 228 at 35).

In opposition, Mylan argues that any earlier request for Revlimid® samples would have been futile.  (*See* D.E. No. 237 at 51-52).  It contends that Celgene had a policy—until at least August 2012—that it would not, under any circumstances, sell or provide Revlimid® samples to generic companies for purposes of bioequivalence testing.  (*Id.* at 52).  Indeed, Mylan states that Celgene denied or failed to respond to every generic company's request for Revlimid® samples before 2010.  (*Id.*).  And, in light of this and Celgene's "years stringing along Mylan in its requests for Thalomid samples," Mylan argues that it "was entirely reasonable" that requesting samples in January 2008 would have been futile.  (*Id.*).  Mylan avers that, "[b]ecause of Celgene's anticompetitive conduct, the jury should resolve the issue of what Mylan's development timeline would have looked like in the but-for world."  (*Id.* at 54).

Notably, Mylan argues—in supplemental briefing requested by the Court—that "any determination by the Court that FDA review of Mylan's protocols was required can easily be incorporated into Mylan's existing damages models" because, for both drugs at issue, "the time frame from submission of Mylan's protocols to the conclusion of the FDA's review was a matter of months."  (D.E. No. 271 at 3).  Mylan argues that this is "consistent with the negotiation timelines assumed" by its expert.  (*Id.* ("Adding an express assumption that Celgene would have requested an FDA review (and that Mylan would have pursued it) to each damages timeline

would require only a minor change in the assumptions of the model and no change to the actual damages calculations for each drug.")).

### B.  Analysis

Mylan's damages theory for its Revlimid® claims implicates the following figure from Mylan's expert's report:

**Timing Underlying Mylan's "But For" Entry Into Generic Lenalidomide**

| Event | Time Required | Completion Date |
|---|---|---|
| Request Revlimid Sample | N/A | 1/2008 |
| Time to get Sample | 6-12 Months | 7/2008 to 1/2009 |
| Complete bioequivalence Testing and ready To File ANDA | 6 Months | 1/2009 to 7/2009 |
| File ANDA (after Celgene data exclusivity rights expire 12/27/2009) | N/A | 1/1/2010 |
| Patent Trial | 30 Month Stay | 7/2012 |
| Negotiate REMS and ready to enter | 6-12 Months | 1/2013 to 7/2013 |
| Entry Date Used (Based on Celgene/Natco Licensing Agreement) | N/A | Q2 2022 |

(D.E. No. 228-10, Ex. 99, Figure 2).[19]

Natco filed an ANDA for a generic version of Revlimid® in July 2010.  (Celg. SMF ¶ 113; *see also* D.E. No. 228-10, Ex. 99 at 83).  Mylan's damages theory thus contemplates an ANDA filing for a generic version of Revlimid® in January 2010—*before* Natco.  (D.E. No. 228-

---

[19]     Giving Mylan the benefit of the doubt, the Court sets aside—for purposes of summary judgment—Mylan's allegation in its Complaint that: "In January 2009, Mylan began efforts to develop a generic equivalent to Celgene's Revlimid."  (D.E. No. 1 ¶ 131).

10, Ex. 99 at 106).  Importantly, this means that Mylan's damages model involves Mylan having "first-to-file" status and benefitting from the lucrative 180-day exclusivity period.  (*See id.* at 107).  In turn, this means that no other generic company could have marketed a generic version of Revlimid® before the fourth quarter of 2022 besides Mylan.  (*See id.* at 110).  Mylan agreed at oral argument that, for its existing damages model, it would need to be the first-filer.  (*See* D.E. No. 277 at 111:19-23; *see also id.* at 124:15-17).

But, for reasons already discussed, the Court finds that Celgene is entitled to summary judgment on Mylan's claims concerning pre-FDA approval of Mylan's study protocols.  In other words, there is no genuine issue of material fact that Celgene had an objectively legitimate business justification for requiring FDA approval of study protocols before turning over Revlimid® samples.  And Mylan did not seek Revlimid® samples from Celgene and get FDA approval of its protocols until 2013—and did not communicate said FDA approval to Celgene until 2014.

Unlike for its Thalomid® claims (discussed below), Mylan proffers no damages model for its Revlimid® claims that contemplates an ANDA filing *after* FDA approval of its study protocols.  Moreover, Mylan does not point to any evidence that Mylan could have developed its study protocols for its lenalidomide ANDA sooner than it actually did—which Celgene noted at oral argument.  (*See* D.E. No. 277 at 117:7-12).

In contrast, for its Thalomid®-related claims, Mylan's expert proffers a damages calculation that is *not* entirely invalidated by the Court's ruling concerning FDA approval of Mylan's protocols: "I calculate damages assuming the following characteristics of the 'but for world' . . . Mylan's launch is delayed to Q3 2012 under the assumption that *Celgene does not*

*provide samples until after Mylan gets FDA approval for its safety protocol*." (D.E. No. 228-10, Ex. 99 at 120 (emphasis added)).

At oral argument, Mylan's rebuttal boiled down to one concept: futility. Mylan reasons that, "had Celgene not engaged in this recidivist behavior," then "samples would have been requested and the process would have begun much earlier than it did" because "Mylan had identified Revlimid® for potential generic entry many years before, certainly by 2008." (D.E. No. 277 at 87:16-21). According to Mylan, "[t]here's no question that it could and would have begun the process then, and so rather than getting FDA approval in 2013, it would have gotten it in 2009 or earlier." (*Id.* at 87:21-24). Mylan submits that, by January 2008, pursuing a generic version of Revlimid® was an opportunity for Mylan—"and had Celgene not been the problem that it had shown itself to be, . . . there's really no question that samples would have been requested at that time." (*Id.* at 103:21-24; *see also id.* at 104:14-15 (arguing that "asking for the samples had been demonstrated to be futile, expensive and painful")). Mylan stresses that "a demand is not necessary to show futility," and "the facts overwhelmingly demonstrate that such a request would have been futile." (*Id.* at 104:19-22).

Setting aside that Mylan's expert proffers no damages calculation assuming that samples are turned over *after* FDA approval of Mylan's protocols, there are still at least two problems with Mylan's position.

*First*, Mylan complains of futility based on Thalomid®-related back-and-forth with Celgene. As discussed, the Court has determined that Celgene cannot be held liable for conduct *before* FDA approval of Mylan's protocols. The back-and-forth preceding that date—November 16, 2007—involved: (1) Mylan's September 2, 2005 request (D.E. No. 228-4, Ex. 16); (2) Celgene's December 19, 2005 response directing Mylan to contact the FDA regarding S.T.E.P.S.

(D.E. No. 228-5, Ex. 18); (3) the FDA's February 12, 2007 letter to Mylan stating that it will exercise enforcement discretion "when Celgene has received confirmation in writing from the sponsor, its agent, or FDA that the sponsor of the study . . . has . . . provided the agency with sufficient assurance that the bioequivalence study will be conducted in such a manner as to ensure the safety of the subjects" (D.E. No. 228-6 at Ex. 28); and (4) the FDA's September 11, 2007 letter to Mylan finding the proposed protocols acceptable and providing 14 recommendations (*id.* at Ex. 30).

So then the critical date is November 16, 2007, when Mylan notified Celgene that the FDA approved its proposed protocols.  This then begs the question: what happened between November 2007 and January 2008 that convinced Mylan that it would be "futile, expensive and painful" to ask for Revlimid® samples in January 2008?

The only potential answer on this record is Celgene's January 8, 2008 letter to Mylan, a conclusion Mylan confirmed at oral argument.  (*See* D.E. No. 228-6, Ex. 34; D.E. No. 277 at 150:25-151:25).  And the Court is unconvinced that a reasonable jury could find futility based on this one letter; it amounts to a mere scintilla of evidence.  After all, in its November 16, 2007 letter, Mylan sought 2,500 capsules of Thalomid®—even though the FDA had notified both Celgene and Mylan in February 2007 that it intended "to exercise its enforcement discretion to permit Celgene to provide to another drug manufacturer (or its agent) 500 units of Thalomid" for bioequivalence testing.  (*See* D.E. No. 228-6, Exs. 26, 28 & 32).  And Celgene noted as much in its January 8, 2008 letter.  (*See id.*, Ex. 34 ("Mylan seeks to purchase 2,500 capsules of Thalomid® . . . .  Mylan's request is contrary to FDA's stated enforcement discretion policy, which established a 500 unit limit.")).  Moreover, Mylan ultimately decided that "it would be fruitless to" respond to Celgene's June 24, 2009 letter.  (Celg. SMF ¶ 53).  Mylan's counsel

characterized this one letter as evidence of that Celgene "was jerking [Mylan] around." (*See* D.E. No. 277 at 151:3-12). But counsel arguing that this is evidence of futility in January 2008 is not enough. *See Berckeley Inv. Grp. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006) (citation omitted) ("[S]ummary judgment is essentially 'put up or shut up' time for the non-moving party: the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument.").

To be sure, Mylan's Head of Global Regulatory Science and Operations submitted a declaration—served after his deposition in this case and after the close of fact discovery—affirming, in relevant part, that:

> 6. Mylan selected lenalidomide as a generic product for development in January of 2008.
>
> 7. Mylan could have requested Revlimid samples from Celgene upon selecting this product for development. The only reason that Mylan did not request samples from Celgene at that time was because Mylan knew, from its Thalomid negotiations with Celgene, that Celgene would not engage in good faith negotiations.
>
> 8. If Mylan requested samples from Celgene in January of 2008, and Celgene negotiated with Mylan in good faith, it should have taken Mylan and Celgene approximately six to twelve months at most to negotiate a supply agreement and for Mylan to receive samples of Revlimid.

(D.E. No. 228-9, Ex. 94 at 2). But this cannot create an issue of material fact about futility because Celgene submits that this conflicts with prior sworn testimony before the FTC and therefore is barred by the "sham affidavit" rule. (*See* D.E. No. 228 at 41). Mylan never responds to this—which Celgene notes. (*See* D.E. No. 240 at 16-17).

*Second*, even accepting that somehow the January 8, 2007 letter is enough for a jury to find futility, there is another problem: "there is not a single shred of evidence in the record,

expert or otherwise, that [Mylan] could have gotten their FDA *protocols* completed, submitted and approved." (*See* D.E. No. 277 at 108:14-16 (emphasis added); *see also id.* at 109:5-9 ("They don't have any expert who says – and they've got experts who say a lot of stuff here that we don't agree with. But none of them say oh, and you somehow could have wound the clock backwards on FDA protocol development and FDA review.")). Celgene stressed this point at oral argument. (*See id.* at 117:5-12, 140:3-10, 146:17-24, 147:2-16). And it is correct: Mylan points to no *evidence* that its study protocols would have been prepared and approved. This is simply not accounted for in Mylan's timetable for market entry of a generic version of Revlimid® or Mylan's Revlimid® damages model (as it is for Thalomid®).[20]

Accordingly, the Court grants Celgene summary judgment on Mylan's Revlimid® damages claim; relief sought for any claim concerning Revlimid® is hereby limited to injunctive relief.[21]

### XIII. Celgene's statute-of-limitations defense for Mylan's Thalomid®-related claims is denied without prejudice

#### A. The parties' contentions

##### 1. Before oral argument

Celgene argues that Mylan cannot recover for injuries caused only by acts outside the four-year limitations period for antitrust claims. (*See* D.E. No. 228 at 44; D.E. No. 240 at 19). It contends that Mylan cites Celgene's conduct regarding Thalomid® samples between 2005 and 2009, with the last act occurring on June 24, 2009. (D.E. No. 240 at 19). But Celgene states that Mylan sued more than four years later, on April 3, 2014. (*Id.*). So Celgene asserts that "[t]he

---

[20]     In fact, on August 24, 2012, Mylan submitted its lenalidomide protocols to the FDA—but did not receive FDA approval until July 29, 2013. (*See* D.E. No. 228-9, Exs. & 91).

[21]     For the reasons stated on the record, the Court denies Mylan's eleventh-hour request to change its damages model. (*See* D.E. No. 271 at 3; D.E. No. 277 at 125:21-136:13, 152:2-13).

statute of limitations for Mylan's claims regarding Thalomid began to run on the date of Celgene's [June 24, 2009] letter, and it expired on June 24, 2013." (D.E. No. 228 at 45).

Further, Celgene argues that "Mylan cannot extend the statute of limitations indefinitely by asserting a 'continuing refusal to deal'" because "[e]ven a 'continuing offense' requires proof of a specific injurious act by the defendant within the limitations period." (*Id.* (citations omitted)). It argues that, if "the law was otherwise, the statute of limitations would be nonexistent for refusal-to-deal claims" because a "plaintiff would be free to wait to sue for years, or decades, after the defendant communicated a refusal to deal, only then to claim that the refusal 'continued' into the limitations period because the defendant did not sell to the plaintiff in the meantime." (*Id.* at 48).

In opposition, Mylan counters that the general rule regarding accrual of the limitations period does not apply when, as here, damages are unascertainable at the relevant time. (D.E. No. 237 at 41-42). It argues that, for claims involving unascertainable damages, the limitations period starts when damages become concrete and measurable. (*Id.* at 42). And Mylan avers that its damages claim "is based on lost profits from the sales of generic thalidomide it would have made but for Celgene's refusal to supply samples." (*Id.*). Mylan's view is that "future lost profits had not accrued" as of June 24, 2009. (*Id.*). Mylan states that, before it could start making sales, Mylan still needed to take certain steps to secure FDA approval—which could not happen without samples. (*Id.*). So Mylan says that damages began accruing when it would have entered the market in the third quarter of 2010 because that was when the injury was suffered. (*Id.*).

Further, Mylan contends that its Thalomid®-related claims are timely because of another exception to the general statute of limitations rule: the doctrine of continuing violations. (*Id.*

(citations omitted)).   It argues there is evidence that "Celgene committed several overt acts demonstrating the existence of a continuing scheme to protect its franchise from generic competition during the limitations period": (1) "Celgene continued to harm competition by delaying or outright foreclosing generic entry on Thalomid"; and (2) "in conjunction with shifting the Thalomid market to Revlimid, Celgene carried out its policy of categorically refusing to supply Revlimid samples to every generic that requested it, a policy that existed until at least mid-2012."  (*Id.* at 43 (internal citations omitted)).

Regarding this second point, Mylan avers that, "[u]ntil at least 2012, Celgene continued to tell the FDA, FTC, and [the Connecticut Attorney General] that it should not have to sell samples to generics, but even if it must field requests, it should be permitted to do so via a procedure of its own choosing—one that would enable Celgene to maintain its monopoly power in the Revlimid market" and delay or foreclose Mylan's entry just like Celgene has done for thalidomide.  (*Id.* at 44).  In particular, Mylan argues that "Celgene's May 14, 2013 and March 20, 2014 letters to Mylan contained requests for information that were nearly identical to the categories of information that Celgene demanded in its January 8, 2008 letter regarding Thalomid"—which "constitute overt acts within the limitations period necessary to show the existence of Celgene's scheme to protect its franchise, because it was this entire scheme that caused Mylan's Thalomid harms."  (*Id.* at 44).

In reply, Celgene argues that "damages for generic entry are not 'unascertainable' up to the moment of market entry, and indeed, Mylan is seeking *Revlimid* damages based on a projected market entry date that remains [four] years into the future."  (D.E. No. 240 at 19 (emphasis in original)).  As for Mylan's continuing-violations argument, Celgene argues that neither of Mylan's arguments make sense because: (1) "it is undisputed that Celgene did *nothing*

to Mylan with respect to Thalomid after the limitations period began, so any violation did not 'continue' long enough to rescue Mylan's damages claim"; and (2) "Mylan cannot lump Thalomid and Revlimid into a single continuing 'violation,'" and "Mylan offers no authority that permits it to bootstrap Celgene's conduct with respect to one alleged product market into a 'continuing violation' with respect to wholly separate conduct allegedly impacting a different product market." (*Id.* at 20-21 (citations omitted) (emphasis in original)).

### 2. At oral argument

Mylan stressed that its argument relating to unascertainability is as follows:

> even under the assumptions in the damages model which are the earliest in terms of time, entry doesn't occur until 2010, within the limitations period. But prior to 2010, Mylan is not making money, it's incurring losses. It's making investments, it's doing this, it's doing that. But it hasn't sold anything in the market. The only time a cause of action accrues is when you're injured, and Mylan would not, certainly in this case, have been injured until it actually began selling the pills in the marketplace.

(D.E. No. 277 at 155:2-10).

Celgene responded that, "as a legal matter," it is "permissible" for one to "file a lawsuit on day one and . . . ask for damages for lost profits into the future." (*Id.* at 158:21-23). Celgene argues that this is, in fact, what Mylan's Revlimid®-related claim is because it contemplates lost future profits in 2022—and "[u]nder their logic, that claim never accrued." (*Id.* at 159:1-6). In Celgene's view, "the question in this case" is "as of June 2009 . . . was your Q3 2010 entry and whatever lost sales you had then, was it so speculative and unprovable as of '09 that [Mylan] literally didn't have a claim, and so the claim wouldn't accrue until September of 2010." (*Id.* at 160:1-6). Celgene stressed that its position "is that both as a matter of law and as a matter of the record in this case, the damages model that they have submitted -- that they submitted in June of 2016 [in this case], they could have done the exact same thing back in '09 and surely within four

years of '09" as Mylan has not "pointed to a single magical event or series of events that took place between June 2009 and September 2010 when they say they would have come to market" that would make damages unascertainable until September 2010.  (*Id.* at 166:21-167:4).

In response, Mylan emphasized that it "could not have been injured prior to 2010 even if damages could have been calculated in 2009" and "damages could not have been calculated in 2009."  (*Id.* at 168:11-13).  Mylan seems to argue that, even though it made predictions, "those could be challenged as speculative"—and, even if calculations can be made, "the injury does not begin until pills are actually sold in the marketplace."  (*See id.* at 169:9-21).

Celgene then countered that the applicable precedent "make[s] clear you're not prohibited from suing for -- today for harm in the future" and the "question is given the nature of your case, given the nature of the claim, given the market . . . is it such that today you really – you really don't know whether you've been harmed in the future."  (*Id.* at 171:5-10).  It asserts that, "as a matter of law, Mylan is just wrong that a claim in a generic delay case does not – can't accrue until we somehow pass the date of my expert's but-for entry date."  (*Id.* at 172:3-5).

### 3.   After oral argument

"[B]ecause the parties appeared to present the Court with remarkably divergent interpretations and related arguments on the relevant law and its application to this matter," the Court ordered supplemental briefing.  (*See* D.E. No. 276).  In this briefing, the parties argue as follows.

Celgene reiterates that June 24, 2009, is the starting point, stating that "Mylan repeatedly threatened to sue Celgene well before this date."  (D.E. No. 280 at 1 (footnote omitted)).  Regarding the ascertainability exception, Celgene posits that the limitations period begins when a plaintiff could have estimated the size of and possible profits of market entry.  (*Id.* at 2-3

(citation omitted)).  Celgene contends that Mylan "offers no coherent argument that its alleged Thalomid-related damages were so speculative in June 2009 as to be unrecoverable as a matter of law"—and it "has not argued that that there was any uncertainty in 2009 about whether Mylan would launch a generic Thalomid product in the future or that Celgene's conduct had delayed Mylan's entry into the market."  (*Id.* at 3).  Celgene asserts that nothing Mylan relies upon was unknown to Mylan in June 2009, "nor even reflect events that occurred between June 2009 and the third quarter of 2010 that could have made damages less speculative."  (*See id.* at 3-4).

Celgene avers that Mylan offered a "new legal argument" at oral argument: regardless of whether Mylan's future damages were ascertainable in 2009, Mylan's cause of action could not have accrued in 2009 because Mylan could not have been injured until market entry in 2010.  (*See id.* at 4).  Celgene contests this argument, arguing (among other things) that the law plainly is "that a claim for provable future damages accrues on the date of the wrongful conduct."  (*Id.*).  Moreover, Celgene notes that this conflicts with Mylan's Revlimid®-related claim and that, under its theory, it would have to wait until 2022 to pursue such a claim.  (*Id.*).

Regarding the continuing-violation exception, Celgene argues that all of Mylan's cited case law "involved an overt act that injured the plaintiff during the limitations period"—which Mylan has failed to identify here regarding Mylan's ability to sell a generic version of Thalomid®.  (*Id.* at 5).  Celgene contends that its dealings with other generic companies regarding Thalomid® samples, as well as its dealings regarding Revlimid® samples, do not qualify as overt acts for Mylan's Thalomid®-related claims.  (*Id.*).

For its part, Mylan begins by noting that its common law claims—unfair competition and tortious interference with economic advantage—are *not* implicated by Celgene's statute-of-limitations defense.  (*See* D.E. No. 281 at 1).  As for its antitrust claims, Mylan argues that a

"claim has not accrued if *either* the fact of accrual is speculative *or* the amount of damages is unprovable." (*Id.* at 2 (emphasis in original)).  And Mylan contends that, here, "*both* the fact and any amount of thalidomide damages were speculative—at least sufficient to raise an issue of fact that the speculative damages exception delayed the statute of limitations from running until the injury was first suffered in Q3 2010."  (*Id.* at 3 (emphasis in original)).

Mylan contests Celgene's Revlimid® comparison, arguing that its Revlimid®-related "damages claim has accrued because the fact that Natco engaged in patent litigation with Celgene and was able to obtain a settlement, coupled with the fact that Mylan was well equipped to do the same, means that the fact of Mylan's Revlimid-related injury is ascertainable." (*Id.* at 4).  And Mylan argues that "the amount of Revlimid damages is not speculative because market factors necessary for formulating the damages model . . . are already specified in detail in the real-world Celgene/Natco settlement agreement."  (*Id.* (citations omitted)).

Mylan also maintains its continuing-violations theory for three reasons: (1) "Celgene's overt conduct against other generics such as Lannett . . . confirmed Celgene's refusal to deal policy, which continued to injure Mylan throughout the limitations period"; (2) "[g]iven Celgene's overarching strategy to protect its franchise, Celgene's refusal to supply Revlimid samples to Mylan in 2013 and 2014 reaffirmed to Mylan that Celgene would continue to prevent it from introducing generic versions of both of Celgene's thalidomide products"; and (3) "under the guise of REMS, Celgene continued to impose restrictions that blocked normal distribution channels from supplying samples to Mylan and other manufacturers."  (*Id.* at 5).

### B.  Analysis

As an initial matter, Mylan is correct about its common law claims—which Mylan argues are governed by a six-year statute of limitations: they are not affected by Celgene's statute-of-

limitations defense.  (*See* D.E. No. 281 at 1).  Celgene has not moved to dismiss Mylan's Thalomid®-related common law claims using this defense.  Thus, these claims—unfair competition and tortious interference with economic advantage—are not subject to any time bar. And, because the Court denies Celgene's only remaining challenge regarding Mylan's Thalomid®-related claims discussed *infra*, the Court must hold a jury trial over Mylan's Thalomid®-related claims.

As for Mylan's federal and state antitrust claims, the parties do not dispute the statute of limitations is four years.  *See* 15 U.S.C. § 15b; N.J.S.A. § 56:9-14.  The accrual date is the issue. And, as evident from the Court's rather painstaking review of the parties' contentions, this is one that is vigorously contested.

On a motion for summary judgment, the "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Anderson*, 477 U.S. at 255.  And the Supreme Court has never suggested that "trial courts should act other than with caution in granting summary judgment or that the trial court may not deny summary judgment in a case where there is reason to believe that the better course would be to proceed to a full trial."  *Id.*[22]

Here, as noted, the Court will hold a jury trial over Mylan's Thalomid®-related claims. And the continuing-violations doctrine, in particular, gives this Court pause to grant judgment as a matter of law at this time.  After all, "[t]he purposeful nature of the inaction—here an ongoing

---

[22]    *See also United States v. Certain Real & Personal Property Belonging to Hayes*, 943 F.2d 1292, 1297 (11th Cir. 1991) ("A trial court is permitted, in its discretion, to deny even a well-supported motion for summary judgment, if it believes the case would benefit from a full hearing."); *Rheumatology Diagnostics Lab., Inc. v. Aetna, Inc.*, No. 12-5847, 2015 WL 3826713, at *4 (N.D. Cal. June 19, 2015) ("The Supreme Court has recognized that, even in the absence of a factual dispute, a district court has the power to deny summary judgment in a case where there is reason to believe that the better course would be to proceed to a full trial. . . . Here, a summary judgment ruling on the [issue], as plaintiffs have presented it, would resolve only a sliver of their remaining claims, one that is closely intertwined with issues that will be presented to the jury regardless of whether [the issue] is decided as a matter of law. . . . Even assuming that plaintiffs have carried their burden under Rule 56 on [the issue], the better course here is to proceed to a full trial.") (internal quotation marks and citation omitted).

refusal to sell . . . —obviously constitutes an injurious act, although perhaps not an overt one in the commonly-understood sense."  *In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144, 1172 (3d Cir. 1993).  "[C]ertain conspiracies, such as boycotts, operate through inaction."  *Id.*  "[O]vert acts aren't what cause damage"; "[i]t is the effectiveness of the overall conspiracy that causes damages."  *Id.*

The Court finds that, at this juncture, Celgene's statute-of-limitations defense risks being too intertwined with issues of material fact.  Factual development at trial concerning Mylan's Thalomid®-related claims will permit the Court to best assess the parties' contentions.[23]  Therefore, in an abundance of caution and consistent with this Court's discretion given the posture of this matter, the Court denies without prejudice Celgene's motion as it concerns this defense.  *See, e.g.*, *Certain Real & Pers. Prop. Belonging to Hayes*, 943 F.2d at 1297 ("A trial court is permitted, in its discretion, to deny even a well-supported motion for summary judgment, if it believes the case would benefit from a full hearing.").

### XIV.  An issue of material fact exists about whether Mylan would have "skinny-labeled" in light of Celgene's orphan drug exclusivity for Thalomid®

#### A.  Relevant factual background

On July 16, 1998, the FDA approved Celgene's NDA for Thalomid® for the treatment of manifestations of a particular form of leprosy known as ENL.  (Celg. SMF ¶ 9).  On May 25, 2006, the FDA approved using Thalomid® in combination with dexamethasone for the treatment of newly diagnosed multiple myeloma.  (*Id.* ¶ 18; D.E. No. 228-4, Ex. 12; D.E. No. 237-21, Ex.

---

[23]     For example, Mylan complains that "Celgene has an overarching strategy to protect its franchise of thalidomide and its analogs, including lenalidomide," and therefore "Celgene's refusal to supply Revlimid samples to Mylan in 2013 and 2014 reaffirmed to Mylan that Celgene would continue to prevent it from introducing generic versions of both of Celgene's thalidomide products."  (D.E. No. 281 at 4-5).  And the following is undisputed: Celgene's Thalomid® marketing expenses dropped from approximately $24 million in 2005 to approximately $14.1 million in 2006 and its Revlimid® marketing expenses increased from $18.9 million in 2005 to approximately $51.4 million in 2006 (Celg. Reply SMF ¶ 133)—and, in 2009, Celgene either did not respond to or categorically refused all requests from generics to purchase Revlimid® samples (*id.* ¶ 235).  And lenalidomide, an analogue of thalidomide, is a more potent product with a better toxicity profile.  (Celg. SMF ¶ 86).

P58).  The multiple-myeloma indication was protected by an orphan drug exclusivity, meaning that no manufacturer other than Celgene could be approved by the FDA to market thalidomide for that indication until May 25, 2013.  (Celg. SMF ¶¶ 18, 71).

On September 26, 2003, Mylan formally selected thalidomide for development.  (*See* Celg. Reply SMF ¶ 174).  Thalidomide was identified as a "first to file" opportunity, meaning that it was an opportunity to obtain the potentially lucrative 180-day exclusivity period.  (*See id.*).

In December 2006, Barr Laboratories ("Barr"), another generic company, filed an ANDA to market a generic version of Thalomid®.  (Celg. SMF ¶ 71).  But Barr asked the FDA to approve a label addressing the *non*-orphan indication (i.e., ENL) without mentioning the orphan indication (i.e., multiple myeloma).  (*Id.* ¶¶ 71, 72).  In other words, Barr's ANDA proposed to carve out multiple myeloma and sought approval for ENL only.  (*Id.* ¶ 72).  This type of carve-out request is also known as a "skinny label."  (*Id.*).

### B.  The parties' contentions

Celgene argues that "[i]t is undisputed that, until May 2013, [its] orphan drug exclusivity prevented the FDA from approving any generic thalidomide product that included a multiple-myeloma indication on its label."  (D.E. No. 240 at 22).  Celgene insists that Mylan's Head of Global Regulatory Affairs "twice testified that Mylan intended to have a multiple-myeloma indication on its generic thalidomide label."  (*Id.*).  Celgene also criticizes Mylan's declarations filed "days before" its opposition to summary judgment.  (*Id.* at 23).

But Celgene avers that, even with these declarations, there is still no testimony that Mylan would have sought to carve out a multiple-myeloma indication from its label—only that it *could* have.  (*Id.*).  Finally, Celgene dispenses with Mylan's internal 2006 documentation that

purportedly indicates that Mylan anticipated launching thalidomide without a multiple-myeloma indication because, at the time of that documentation, the FDA had not approved Thalomid®'s multiple-myeloma indication.   (*Id.* at 24).   Simply put, Celgene argues that the 2006 documentation could not anticipate a multiple-myeloma indication.  (*Id.*).

In opposition, Mylan argues that Celgene ignores testimony of its Head of Global Regulatory Affairs that "she was unable to opine on Mylan's labelling strategy regarding thalidomide because Celgene's refusal to supply samples prevented Mylan from proceeding to the stage of development at which it would consider its labelling strategy."  (D.E. No. 237 at 45 (citation omitted)).   Mylan further argues that other people who did not report to this Head of Global Regulatory Affairs were responsible for drafting labels before 2013.   (*Id.* at 45-46). Mylan cites her declaration in which she purportedly says that Mylan regularly employs carve-out strategies for indications covered by orphan drug and other exclusivities.  (*Id.* at 46).  Mylan also cites a declaration purporting to explain that it does not finalize indications on its label for a generic product until bioequivalence testing is complete.  (*Id.* (citation omitted)).

Finally, Mylan says that it has adduced multiple pieces of evidence and circumstances that make this inquiry suited for a jury, including: Barr's submission of a carved-out label; Mylan's financial incentive to file an ANDA as soon as possible for a first-to-file opportunity; Mylan carves out labels when necessary; and a 2006 planning document envisioning a launch without the multiple-myeloma indication.  (*Id.* at 48).

### C.  Analysis

Mylan's evidence must be believed, and all justifiable inferences are to be drawn in its favor.  *See Anderson*, 477 U.S. at 255.  It is undisputed that, on September 26, 2003, Mylan formally selected thalidomide for development—and this was identified as a first-to-file

opportunity.  (Celg. Reply SMF ¶ 174).  Mylan's Head of Global Policy submitted a declaration that "Mylan does not finalize its generic labels, including finalizing what indications to include, until after bioequivalence testing is complete."  (D.E. No. 238-30, Ex. P316).  She added that, generally, "a generic label will be finalized just before the related [ANDA] is submitted" and then the label is "updated as needed based on any relevant changes post submission to the [brand-name label], patent or exclusivity landscape."  (*Id.*).  For Thalomid®, she affirmed that "Mylan was unable to conduct bioequivalence testing because it never had access to Thalomid samples"—and "Mylan does not make labelling decisions until after bioequivalence testing is complete and we are preparing the labeling section of the ANDA."  (*Id.*).  And "Mylan regularly employs carve out strategies—successfully submitting and gaining approval for ANDAs that exclude (or 'carve out') indications covered by orphan drug and other exclusivities, while including all other FDA approved indications."  (*Id.*).

And Mylan's Head of Global Regulatory Affairs affirmed in his declaration that "Mylan does not finalize indications on its label for a generic product until bioequivalence testing is complete and we are preparing the labeling section of the ANDA."  (D.E. No. 237-20, Ex. P52).  He too declared that "Mylan never had access to Thalomid for bioequivalence testing and thus had not finalize its label"—and "that Mylan regularly submits and gains approval for ANDAs that carve out indications subject to exclusivities including [orphan drug exclusivity]."  (*Id.*).

As noted above, Barr's ANDA for a generic version of Thalomid® employed a carve-out. (*See* Celg. SMF ¶¶ 71, 72).

Celgene disputes that there is any genuine issue of material fact.  In particular, Celgene argues that nobody said what "Mylan's label would have said."  (*See* D.E. No. 277 at 180:10-11; *see also id.* at 181:3-6).  And Celgene stresses several other points (*see, e.g.*, D.E. No. 240 at 22-

25)—all of which may ultimately win the day.  But not at this point because the Court must give Mylan the benefit of reasonable inferences.  And the evidence is such that a reasonable jury *could* find in favor of Mylan on this skinny-labelling issue.  The Court therefore denies Celgene's motion relating to Celgene's orphan drug exclusivity.

### XV.    Conclusion

The Court has endeavored to carefully consider an extensive record juxtaposed against a complex and developing area of law.  In that vein, it is important to note that—as tempting as it may be to do so—the issue of FDA approvals of generic study protocols for brand drugs requiring REMS is one that the Undersigned believes requires careful consideration of the specific facts and circumstances.  And the analysis presented above is tailored to the specific facts and circumstances of this case.

To summarize, the Court finds that, until the FDA approved Mylan's protocols and Celgene was so notified, it had a legitimate business justification for refusing to sell Mylan samples given the record before the Court.  Conversely, however, the propriety of Celgene's conduct after FDA approval requires factfinding.  Further, Mylan cannot recover monetary damages for its Revlimid® claims on this record.  But the Court declines to find—at this time— that Mylan's Thalomid® claims are either time barred or that any attendant damages are barred by Celgene's orphan-drug exclusivity.  These issues require factfinding.  Finally, Mylan's state-law claims—both antitrust and otherwise—cannot be dismissed in their entirety in light of the Court's rulings.

An appropriate Order accompanies this Opinion.

*s/ Esther Salas*
**Esther Salas, U.S.D.J.**